CHUGACH ELECTRIC ASSOCIATION,
Appellant,

v.

NORTHERN CORPORATION, Appellee.

NORTHERN CORPORATION,
Cross-Appellant,

v.

CHUGACH ELECTRIC ASSOCIATION,
Cross-Appellee.

Nos. 2779, 2891.

Supreme Court of Alaska.

April 8, 1977.

Sanford M. Gibbs, Anchorage, for appellant and cross-appellee.

Donna C. Willard, Anchorage, Bruce T. Rinker, Seattle, Wash., and Peter B. Walton, Anchorage, for appellee and cross-appellant.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR and BURKE, JJ.

RABINOWITZ, Justice.

The instant appeal and cross-appeal mark the third occasion this litigation comes before us.[1] Prior to discussing the numerous specifications of error which have been advanced in the appeal and cross-appeal, the history of this case will be related.

---

1. *See Continental Ins. Co. v. United States Fidelity & Guar. Co.*, 528 P.2d 430 (Alaska 1974); *Northern Corp. v. Chugach Elec. Ass'n*, 518 P.2d 76, *modified on rehearing*, 523 P.2d 1243 (Alaska 1974).

In 1966 Northern Corporation and Chugach Electric Association entered into a contract for the repair and protection of the upstream face of the Cooper Lake Dam. Due to circumstances not here relevant, Northern and Chugach amended the contract to provide that riprap and filter layer stone was to be quarried at the opposite end of the lake from the dam and transported across Cooper Lake to the dam site when the lake was frozen to a sufficient depth to permit the hauling of heavy loads. Northern began the ice haul method in the winter of 1966–67 but encountered serious difficulties. By the time the ice was thick enough to support hauling, there were water overflows of one to two feet in certain areas. Northern tried many routes in an attempt to find a safe crossing and made objections to Chugach about the condition of the ice, but Chugach insisted on performance. On March 11, 1967, a Euclid front end loader, which was used to clear the snow from the ice, broke through the ice and was lost. Chugach was informed of the loss but, in a letter dated March 21, again insisted on performance. On March 27, Northern was directed by Chugach to resume operations by the following morning or be held in default. Northern complied with this directive. After repeated efforts to haul the rock involving a number of near losses of equipment, including one small tractor, Northern stopped work on March 31, 1967. A letter, dated March 31, 1967, was sent to Chugach informing them of the suspension of all work. The stoppage of work at this time was done apparently with the approval of Chugach. Some of Northern's equipment was left at the work site.[2]

During the summer and fall of 1967, Northern made repeated attempts to ascertain their position with respect to the subject contract; Chugach did not respond until January 8, 1968. The January 8 letter from Chugach informed Northern that:

. . . Because CEA cannot permit this work to drag on indefinitely, please take notice that, except that you commence this work and prosecute it with proper diligence so as to have hauled all rock by April 1, 1968, CEA will declare you in default under the contract and take such further steps with your surety or otherwise as may be necessary under the circumstances.

In a letter dated January 20, 1968, Northern informed Chugach they were mobilizing for a haul at Cooper Lake. The ice conditions at Cooper Lake were much improved over what they had been the previous winter. There was only a small amount of snow, the ice was frozen to what was believed to be the proper depth, and there were no overflow problems.

On February 1, 1968, Northern began hauling the rock across the ice in trucks that were only partially loaded. Two trucks broke through the ice, resulting in the death of both drivers and the loss of the trucks. Northern stopped all operations at this point and informed Chugach on February 16, 1968, that it would "make no further attempts to haul across the ice." By letter of March 28, 1968, Northern declared a termination of the contract.

In September 1968, Northern brought suit against Chugach seeking $139,957.25 in damages, the difference between the amount it expended in attempting to perform the contract and the amount received from Chugach. Chugach counterclaimed for liquidated damages in the amount of $28,250.[3] After an aborted trial before Judge Eben Lewis, the case was tried, with-

---

2. M. E. Bowdish, Sr., president of Northern, explains that they left the equipment because they thought that they might have to continue with the contract, inasmuch as they had never been released from performance by Chugach. Pete Bowdish, vice-president of Northern, stated that Chugach had said that if Northern left they wanted to take over the equipment in order to have someone else finish the job. However, Pete Bowdish went on to say:

Well, I called [Andy Johnson, project supervisor for Chugach] up and told him that I gave up and I'd leave the equipment there before I told anyone to go home from Chugach . . ..

3. Chugach also counterclaimed for $6,000 but this claim was abandoned at trial.

out a jury, before Judge James Singleton. The superior court ruled that both parties to the contract were discharged from further performance due to a supervening impossibility, *i.e.,* the inability to transport the rock by the ice haul method. No damages or attorneys' fees were awarded.

In our opinion in the first appeal of this matter, we held that the contract was incapable of performance. *Northern Corp. v. Chugach Electric Ass'n,* 518 P.2d 76, 80 (Alaska 1974). However, we did not approve of the superior court's resolution of the damage issue. Although we agreed with the superior court's determination that the parties' modification of their contract to include utilization of the ice haul method was the result of arm's length bargaining, we held that Northern's increased costs incurred "after such time as Chugach was reasonably placed on notice that it was not feasible to perform the contract" should be recompensed.[4]

Chugach petitioned for rehearing, claiming, *inter alia,* that the decisional law cited in our opinion did not support the change order theory which we had employed in our first opinion. The petition was granted and further briefing ordered on the damage issue. In our Opinion on Rehearing we abandoned the rationale of an implied change order and focused instead on the alteration in the parties' relationship once Northern had notified Chugach that it did not believe the contract could be performed by the ice haul method and Chugach had insisted on performance. We held that Northern was entitled to recover its extra costs from that point until some future time, prior to the termination of the contract, when Northern "had actual knowledge or should have known that the ice haul method was impossible."[5] Under our Opinion on Rehearing, the matter was remanded to the superior court with instructions to make the "determinations" indicated in our opinion.

On remand, Northern moved for a hearing in order to introduce further evidence relating to the matters highlighted in the Opinion on Rehearing. That motion was denied. The superior court requested counsel to submit memoranda pointing out matters in the record which were relevant to the issues delineated by our Opinion on Rehearing. On September 18, 1975, the superior court rendered its decision, finding that Northern "reached the conclusion that there was a substantial likelihood that they could not successfully perform the contract, and so notified Chugach" at the time that the Euclid loader broke through the ice and the smaller tractor broke through the overflow. The trial court separated the construction season of 1966–67 from that of 1967–68. Thus, the superior court ruled that for the 1966–67 season Northern was entitled to damages from the middle of March[6] to March 31, 1967, when Northern ceased operations. As to the 1967–68 season, the superior court found that due to the dramatic change in ice conditions at the lake neither party

> had actual knowledge that the ice-haul method was not feasible in '68 at any time until the trucks went through the ice.

Thus, finding "no time lag between notice to Chugach of the possible impracticability of the ice haul method and Northern's actual knowledge of its impracticability," the superior court did not award damages for that period in the 1967–68 construction season. After submission of a memorandum on damages by Northern, the superior court awarded Northern $9,140.88, representing costs incurred between March 15 and March 31, 1967. As part of its judgment, the trial court departed from the schedule of attorney's fees in Civil Rule 82 and awarded Northern $14,000 in attorney's fees. The present appeal and cross-appeal followed.

Resolution of the issues in this latest appeal requires particular reference to our

---

4. *Northern Corp. v. Chugach Elec. Ass'n,* 518 P.2d 76, 85 (Alaska 1974). Our decision as to this particular issue was based on a constructive change order pursuant to the "changes" clause of the contract.

5. *Northern Corp. v. Chugach Elec. Ass'n,* 523 P.2d 1243, 1247 (Alaska 1974).

6. The loader was actually lost through the ice on March 11, 1967.

Opinion on Rehearing.[7] There we recognized that, although at the time the parties agreed to the use of the ice haul method neither warranted the method, a change in the relationship of the parties occurred once Northern notified Chugach "that it believed the contract was not possible to perform," and Chugach opted to insist on performance.[8] In our Opinion on Rehearing, we specifically held that:

. . . Chugach thereafter impliedly warranted that method in the same manner as if it had unilaterally established the specification at the time the contract was entered.[9]

We went on to hold:

[I]f Northern had actual knowledge of the impossibility, or should have had such knowledge, as opposed to knowledge indicating a likelihood that the contract *might* be impossible to perform, Northern should not be entitled to recover for work done after such time as it had such actual knowledge or should have so known.[10] (emphasis in original)

Although we abandoned our prior rationale of a constructive change order, we retained the damage formula articulated in *Hol-Gar Manufacturing Corp. v. United States,* 360 F.2d 634, 175 Ct.Cl. 518 (1966)[11] together with the mitigation factor relating to performance after knowledge of impossibility espoused in *L. W. Foster Sportswear Co. v. United States,* 405 F.2d 1285, 186 Ct.Cl. 499 (1969).[12]

Chugach and Northern contend that the superior court misinterpreted the Opinion on Rehearing in *Northern Corp. v. Chugach Electric Ass'n,* 523 P.2d 1243 (Alaska 1974). Chugach claims that the trial court applied a "dual standard" not required by the opinion by applying a "notice" standard to Chugach and an "actual knowledge" standard to Northern. Chugach further claims that the superior court should have considered Northern's non-reliance on Chugach's alleged warranty which arose through Chugach's unilateral insistence on performance. Chugach concludes that if the superior court had properly determined the standards involved and had examined the reliance by Northern, it would necessarily have concluded that Northern knew or should have known of the impossibility prior to March 31, 1967. Thus, Chugach contends that no damages should have been awarded to Northern.

Northern faults the superior court's interpretation of the Opinion on Rehearing in three major respects. First, Northern contends that the trial court misinterpreted the requirement of "notice" as it relates to the alteration of its relationship with Chugach. Second, it contends that the trial court erred in failing to hold that once Northern notified Chugach, Chugach warranted the method of performance. Third, Northern contends that the superior court erred in separating the two winter construction seasons. From the foregoing, Northern concludes that it should have been awarded damages from February 21, 1967, through February 1, 1968.

Our study of the superior court's decision has convinced us that the aforementioned contentions of both Chugach and Northern must be rejected. Even if the trial court's references to tort concepts, the U.C.C. and the Restatement of Torts were inappropriate, examination of the superior court's decision reveals a clear understanding and

---

7. *Northern Corp. v. Chugach Elec. Ass'n,* 523 P.2d 1243 (Alaska 1974).

8. *Id.* at 1246.

9. *Id.*

10. *Id.*

11. In *Hol-Gar,* 360 F.2d at 638, the Court of Claims stated:

Since the necessity for the change was not due to plaintiff's fault, but to faulty specifica-

tions, an equitable adjustment requires that plaintiff be paid the increase in its costs over what they would have been had no change been required.

12. In *L. W. Foster,* 405 F.2d at 1290, the Court of Claims stated:

The rationale . . . is that the contractor can rely upon the Government's representations as to how a desired product should and can be made, unless he ought to know better.

proper interpretation of our Opinion on Rehearing.[13]

■ We believe Chugach is in error when it interprets this court's Opinion on Rehearing as mandating a similar standard of knowledge to be applied to both Chugach and Northern. In that opinion we did not require a finding that Chugach have actual knowledge of the impossibility of performance. Rather, we focused on the options that Chugach had available once Northern notified Chugach of its belief that performance was impossible.[14] We think adoption of Chugach's interpretation would result in a logical inconsistency since if the same standard of knowledge were applied to both, Northern would necessarily meet that standard before it informed Chugach of its belief. This would imply that Northern would never be entitled to recover any extra costs. Such a result was not within the contemplation of our Opinion on Rehearing.

■ Chugach also claims that the superior court should have made specific findings relating to Northern's reliance on Chugach's representations. The issue of reliance goes only to the question of when Northern knew or should have known of the impossibility of performance. Since the superior court made findings as to that issue, the fact that it did not make findings as to reliance is irrelevant. However, Chugach's contention goes beyond the failure to make findings. Chugach contends that the superior court never considered the question of when Northern should have known that performance was impossible. Although there is no explicit mention of this standard of notice in the superior court's opinion, we think it implicit in its decision the fact that Northern should not have known of the impossibility prior to March 31. For between March 15, the date chosen by the superior court as representing the change in the parties' relationship, and March 31, the date the superior court determined Northern had actual knowledge, Chugach insisted on performance. Northern tried numerous routes across the lake. According to one witness, Northern had so many roads across the lake that it "looked like the Los Angeles freeways." Northern also tried out suggestions made by Mr. Lappi, Chugach's consulting engineer on the job, but none of them worked. Finally, on March 31, they gave up. Thus, it appears reasonable to conclude that Northern should not have known of the impossibility of performance until they exhausted the suggestions made by Chugach's agent. Even at the point on March 31, 1967, when Northern stopped all operations, they were not certain that Chugach would not want the equipment left in order to have the surety or another contractor finish the job.

Northern's second contention in regard to the superior court's alleged misunderstanding of the Opinion on Rehearing is that the court erred in failing to hold that once notification had been given, Chugach war-

---

**13.** The trial court went into a detailed discussion of the rationale underlying this court's Opinion on Rehearing, which it felt had to do with "reading tort principles into contract law" for "reasons of public policy." The superior court then examined the definitions in the Uniform Commercial Code and the Restatement (Second) of Torts relating to various types of notice and knowledge. The superior court acknowledged that the principles were not made applicable to the case by statute or court decision; the court stated that the examination was made "to understand the context in which specific findings of fact will have to be made." Interpreting this court's Opinion on Rehearing, the trial court further stated:

> In discussing Chugach's [Northern's] obligation, the supreme court shifted from actual knowledge to I think what the code would

call notice because they underlined the word 'might' in discussing Northern's obligation, and said something to the effect of when Northern had actual knowledge as opposed to a belief that it might be impossible, then Northern would lose their right to future damages. In discussing Chugach's obligation . . . the supreme court says this. Where one party believes or has reason to believe or expects or suspects that it has contracted to perform a task that it is not possible to perform, if it gives notice of that belief or suspicion to the other side, in this case Chugach, then Chugach would have 3 options. . . . [I]f it stood on the contract then it in effect assumed the risk that the performance was not possible.

**14.** *Northern Corp. v. Chugach Elec. Ass'n,* 523 P.2d 1243, 1246 (Alaska 1974).

ranted the method of performance. It is an accurate statement that we held that once notification occurred "Chugach . . . impliedly warranted that method." [15] Since this was the only theory upon which Northern could recover any damages and damages were awarded, it is clear that the superior court understood our Opinion on Rehearing in this respect.

 Northern's final contention in regard to the superior court's interpretation of the Opinion on Rehearing is that the superior court erred in treating the two construction seasons separately.[16] Our opinion did not deal with the issues presented by the different circumstances which confronted the parties during the second winter construction season. The record shows that in the second winter there was no overflow problem, the tree stumps were not fracturing the ice, and the ice was frozen to a depth which all the experts had said would support trucks of the weight which would be involved in hauling the rock. The superior court found that the change in circumstances led both parties to believe that in 1968 the ice haul method was not impossible. We think the evidence in the record supports this conclusion.[17] The superior court further found that:

**15.** *Id.* at 1246.

**16.** We think it somewhat puzzling that Northern would contest the superior court's treatment of the second season, inasmuch as it gives them a second opportunity to recover damages. If the court did not consider the change in circumstances, the inquiry would end on March 31, 1967, when, according to the court's findings, Northern had actual knowledge of the impossibility. Northern's contention makes sense only because it further contends that the determination that it had actual knowledge on March 31 is clearly erroneous.

**17.** Chugach's letter of January 8, 1968, clearly indicates that they felt that performance was not impossible. M. E. Bowdish, president of Northern, testified that on receipt of that letter . . . the point that we had decided on was whether we could make that attempt in a manner that would be safe enough that we wouldn't jeopardize any lives and possibly be able to haul the rock.
Pete Bowdish, vice-president of Northern, testified that:

[N]either party had actual knowledge that the ice-haul method was not feasible in '68 at any time until the truck went through the ice. I think that both parties reasonably believed that the ice-haul method was feasible in 1968 and acted accordingly. I think that as a practical matter, it wasn't, but they didn't know about it. Nevertheless, there are intimations in letters by Mr. Northern [sic] to Chugach that might give rise to the level of a suspicion or a fear that the ice-haul method was not feasible. But I'm not prepared to say on the record that those intimations were sufficient to meet the test the supreme court has put down.[18]

Situations often arise in which performance is temporarily impossible but subsequently becomes possible. Professor Williston made the following observations about such situations:

Not infrequently there may be excusable impossibility of immediate performance at the time when performance is due, but performance may become possible later. Such temporary excusable impossibility will obviously justify at least temporary non-performance by the promisor unless the promisor has assumed the risk. If the delay caused by impossibility

[S]ince it looked like we were going to have the proper depth of ice and conditions were favorable we thought we'd better do the job because it looked like somebody else would do it if we didn't.
However, at another point, M. E. Bowdish stated:
So, we just simply were forced to make this attempt and either succeed or prove absolutely our contention that the ice was not a safe operation was true.

**18.** The only "intimations" in letters that were to be found in the record after the onset of winter in 1967–68 refer to controlling the conditions on the lake. However, the last two letters also contain statements favorable to the haul. For example, one letter says:
The weather has been treating us very well the last two weeks and conditions look much better than last year.
Another says:
We believe we have sufficient ice on Cooper Lake to start hauling rock on the morning of January 31, 1968.

is excusable and is of short duration, the promisor is still held bound by his promises, except to the extent of such delay. If the impossibility persists for a length of time sufficient to go to the essence of the contract (and only in that case) the temporary non-performance on one side will justify the other party in rescinding the contract altogether. But may the promisee in spite of long delay refuse to take advantage of his excuse and demand performance of the contract as soon as it becomes possible? This depends on whether the promisor would thereby be compelled to render performance substantially different from what he contracted for. If so, he is permanently excused.[19] (footnotes omitted)

Professor Williston also noted that when the impossibility is of uncertain duration, the party whose performance is still possible

may require the party whose performance is for the time being rendered impossible to continue ready and willing to perform whenever the impossibility may cease.[20]

It is established that where the first party requires the second party to remain in readiness to perform, the second party is entitled to compensation.[21] Thus, Northern's contention that the superior court created a second, separate contract is not accurate. The superior court was merely treating the contract as one in which the impossibility was of uncertain duration.

■ The next group of specifications of error, which will be discussed generally, attacks aspects of the superior court's findings of fact. Northern contends that the finding that Chugach received notice of Northern's belief that performance was impossible on March 15, 1967, was clearly erroneous. Chugach in turn contends that the finding that Northern did not have actual knowledge of the impossibility of performance prior to March 31, 1967, was clearly erroneous.[22] Chugach takes the further position that the superior court's findings on remand were not based on any issues raised by the parties or litigated at trial.

■ The record reveals several dates in the 1966–67 construction season which the superior court could have found as the date of notification. Northern's contention that the court should have chosen a date between February 21, 1967, and March 6, 1967, is supported in the record by two communications written by Northern to Chugach.[23] The superior court stated that

---

19. 6 S. Williston and G. Thompson, Law of Contracts § 1957, at 5489–90 (Rev. ed. 1938).

20. *Id.* § 1958, at 5493.

21. *See Id.* at 5494.

22. A finding of fact is "clearly erroneous" when, although there may be evidence to support it, the reviewing court is left with the definite and firm conviction on the entire record that a mistake has been committed. *E.g., State v. Abbott,* 498 P.2d 712, 727 (Alaska 1972); *Alaska Foods, Inc. v. American Mfr's. Mut. Ins. Co.,* 482 P.2d 842, 848 (Alaska 1971).

23. The letter of February 21, 1967, states: We are unable to determine whether serious damage has resulted from [the dropping of the lake's water level] already, but unless Chugach Electric ceases to operate the Cooper Lake Power Plant, it will probably become impossible to perform the hauling of the rock on the ice. The letter of March 6, 1967, describes the ice condition and the attempts to cross the lake. It goes on to state that Northern was attempting

"the only possible remaining solution" which had "no better than a 50% chance of success." The letter also states that:

If an act of God, or other conditions or events beyond our control, *make the operation impossible,* we cannot be held in default. (emphasis added)

M. E. Bowdish testified, with respect to the March 6 letter, that:

I was in this letter, advising Chugach that it just didn't look like we were going to be able to haul rock and I was advising him of what steps that we were taking to try to whip this problem, and I was trying to advise him that I had tried to point this out to their inspector and their engineers with no results. And that I thought the effort we were making was over and above the requirements of the contract and I was going to ask them to review the contract and have them pay for it.

We note that Chugach had a representative, Mr. Lappi, on the job site throughout this first season. Thus, letter communication would not constitute the only possible method of notification. At one point M. E. Bowdish testified that:

it had reviewed the evidence as it related to the question of notice, particularly the letters. It determined that in December 1966, when Northern first mentioned problems of safety, Northern "was not complaining that the ice-haul method was not feasible but only that at that particular point in time it was not practicable to go forward." The trial court further found that in mid-March of 1967 [24] when the Euclid loader was lost,

> Northern reached the conclusion that there was a substantial likelihood that they could not successfully perform the contract that year, and so notified Chugach.

Although there is evidence in the record which would indicate a date earlier than mid-March, we are not left with a "firm conviction on the entire record that a mistake has been committed." [25] However, we note that the superior court erroneously fixed the date on which the loader was lost. We do not believe that the trial court should have considered the letter of February 21, 1967, since, although it had been marked for identification prior to the commencement of the trial, it was not introduced into evidence nor was reference made to it at trial.[26] The overall tone of the March 6, 1967,[27] letter does not indicate a belief that "the contract was not possible to perform." [28] Rather, it indicates that Northern was incurring substantial ex-

penses in pursuing alternative routes in attempting to perform. The reference to one remaining possibility, with even chances of success or failure, indicates that Northern believed that there was a chance that it could perform. Thus, we conclude that the superior court was not "clearly erroneous" in finding that Northern's suspicions were first elevated to a level of belief that the contract was not possible to perform after the loader went through the ice.

As previously noted, the superior court's ultimate delineation of March 15 as the date on which the loader was lost, is clearly erroneous. Chugach acknowledges this fact, but states that:

> . . . unless Northern can demonstrate that Chugach was *notified* on that date that Northern did not believe the contract could be performed, March 11, 1967 has no legal significance to Chugach's liability or damages. (emphasis in original)

Since our Opinion on Rehearing states that the damage period begins running "from the time of Chugach's unilateral insistence," [29] that is a correct statement of the law of this case. The record shows that Northern's first communication after the loss of the loader regarding further actions on that job was the March 16, 1967, letter to Chugach requesting that Northern be allowed to cease operations.[30] However, R.

---

[W]e had a very serious situation developing in our relationship between ourselves and Mr. Lappi, who was representing Chugach at that time. . . . [W]e felt that we were jeopardizing lives of the men that were working on this project trying to even dare haul ice across the road, and Mr. Lappi was assuring us that there was nothing in the world to worry about.

Although it is somewhat difficult to pinpoint the period of time to which Mr. Bowdish is referring, apparently it is the latter part of February and the early part of March.

**24.** The superior court used the loss of the loader as the significant occurrence and referred to the date of loss as mid-March. The trial court determined that Chugach became liable to Northern for any costs between March 15, 1967, and March 31, 1967. The court, in selecting March 15, noted that the 15th is "a somewhat arbitrarily chosen date to fix the middle of March, because the evidence that I'm relying

on speaks of the middle of March rather than the 15th." The loader was, in fact, lost on March 11.

**25.** *See* note 22, *supra.*

**26.** *See* note 23, *supra,* for a portion of the text of the February 21, 1967, letter.

**27.** *See* note 23, *supra,* for a portion of the text of the March 6, 1967, letter.

**28.** *Northern Corp. v. Chugach Elec. Ass'n,* 523 P.2d 1243, 1246 (Alaska 1974).

**29.** *Id.* at 1246.

**30.** In the direct examination of M. E. Bowdish, the following interchange took place:

Q: Now, after [the loss of the loader] occurred, what did you next do with respect to corresponding to Chugach or any of its

A. Johnson, project supervisor for Chugach at the time, testified that Chugach had been notified of the loss by radio from Cooper Lake the day of the accident and he flew to the lake the next morning.[31] Thus, from our study of the record as a whole, we cannot say that it was clearly erroneous for the trial court to have held that March 15 was the date upon which Chugach unilaterally insisted on performance.

We next turn to Chugach's contention that the superior court's finding that Northern did not have actual knowledge of the impossibility of performance prior to March 31, 1967, is clearly erroneous. Chugach claims that:

> . . . the impossibility was or should have been patently obvious to Northern. It is incredible to presume that, given the ice conditions at Cooper Lake in the late winter and early spring, Northern officials could not know, exercising reasonable diligence, that the ice could not hold trucks weighing in excess of 70,000 pounds each.

The superior court, as previously noted, only discussed whether Northern "knew" of the impossibility, rather than "knew or should have known." The trial court stated:

> Northern, of course, knew everything that Chugach knew but I'm not prepared to say that in light of what Northern represents Chugach's experts were telling them, that they had actual knowledge that the ice-haul method was unfeasible at least until Euclid loader went through the ice. And it seems to me that on the better view of the evidence that March 31st would be the date upon which Northern had actual knowledge that it was not feasible to proceed in March.

representatives regarding progress—further progress on the job?

A: On March 16, we wrote a letter to Chugach Electric Association advising them of the accident and requesting permission to demobilize and stop any further attempt to work.

After the loss of the loader, Northern did not resume operations until it was given an ultimatum by Chugach to begin or be found in default. Inasmuch as Chugach had access to expert advice on ice-hauling, it strikes us as somewhat anomalous that Chugach now claims that the impossibility of ice haul procedures was "patently obvious." During the period after March 27 and before March 31, 1967, Northern tried various routes suggested by Chugach's engineer, Mr. Lappi. From our review of the record, we think it reasonable to conclude that Northern neither knew nor should have known that performance was impossible until it exhausted the possibilities suggested by Lappi. Thus, we hold that the superior court's finding that Northern did not have actual knowledge of the impossibility of performance prior to March 31, 1967, is not "clearly erroneous."

Subsequent to the issuance of this court's Opinion on Rehearing, Northern moved the superior court for a hearing on remand in order to present additional evidence and exhibits for the consideration of the court. Northern contends that the denial of that motion constituted reversible error. In our Opinion on Rehearing, we did not mandate that either a new trial or additional hearings be held, but rather only that the case be "remanded to the trial court for the purpose of making the determinations here indicated." Thus, to constitute reversible error, the superior court's denial of Northern's motion for an evidentiary hearing upon remand must have constituted an abuse of discretion.[32] Although the trial court indicated that, in retrospect, it might have been better to hold a new hearing, our reading of the record discloses the existence of evidence on every point relevant to the remand. Thus, we have concluded that under the standard articu-

**31.** The letter of March 16 states that there was a meeting on March 13 in the offices of Chugach in which it was agreed to abandon the construction effort at that time and to seek alternate methods of completing the contract. This letter was not admitted into evidence.

**32.** *See Patrick v. Sedwick,* 413 P.2d 169, 177–78 (Alaska 1966).

lated in *Patrick v. Sedwick,* 413 P.2d 169 (Alaska 1966), the superior court in the case at bar did not commit an abuse of discretion by virtue of its denial of Northern's motion for an evidentiary hearing in conjunction with our remand. In *Patrick v. Sedwick,* we were faced with an appeal from a previously remanded case. There, in holding that the trial court did not abuse its discretion, we said:

> Under the terms of this court's remand the trial court was vested with wide discretion as to the precise manner in which the damage issues were to be determined. And as pointed out earlier, the trial judge concluded upon remand that he could determine the damage issues upon the record of the evidence adduced at the October 1961 trial.[33]

Chugach also specifies as error the superior court's departure from the schedule of attorney's fees as set forth in Civil Rule 82. Northern requested fees, based on the hourly rate charged by its attorneys, in the amount of $20,378.40. The superior court awarded Northern attorney's fees in the amount of $14,000. Had the superior court adhered to the schedule found in Rule 82, Northern would have been entitled to an award of approximately $1,750 in attorney's fees. Thus, Chugach contends that the $14,000 awarded as attorney's fees constitutes an abuse of discretion by the superior court.

■ We have held that review of a grant of attorney's fees is limited to the question of abuse of discretion.[34] In order for us to find an abuse of discretion in the superior court's award of attorney's fees in an amount greater than that provided for in the schedule in Rule 82, it is incumbent upon the complaining party to demonstrate that the trial court's award was manifestly unreasonable.[35] We have further held that when the trial court departs from the schedule in Rule 82, the reasons for that departure should appear in the record.[36]

■ In the case at bar the superior court set out in considerable detail its reasons for departing from the Rule 82 schedule governing attorney's fees. They were as follows:

> (1) the counterclaim by Chugach was 'hotly contested'; had it been successful Northern would have been liable for substantial liquidated damages;
>
> (2) the case is a landmark decision in Alaska contract law, and required the litigation of very difficult legal issues;
>
> (3) two days of trial were wasted due to the late disqualification of Judge Lewis by Chugach;
>
> (4) extensive evidence was taken in this complex and confusing case.

Despite the foregoing, Chugach asserts that the award of attorney's fees constituted an abuse of discretion because Northern failed to make any showing as to why the Rule 82 schedule should not be adhered to, and that Northern's request for attorney's fees must necessarily have included time spent on appeal. As to this latter assertion, Chugach's attorney asked the trial court if its award of attorney's fees included legal work rendered in connection with the previous appeal of this matter. The superior court informed counsel that its award of attorney's fees did not encompass appellate legal services.[37] As to the first ground, we think the reasons articulated by the superior court for its departure from the Rule 82 schedule precludes a determination on our part that the court's award of attorney's fees was "manifestly unreasonable." The trial of this case consumed six days of court time, produced extensive pre-trial and post-

**33.** *Id.*

**34.** *E.g., Continental Ins. Co. v. United States Fidelity and Guar. Co.,* 552 P.2d 1122, 1125 (Alaska 1976); *Palfy v. Rice,* 473 P.2d 606, 613 (Alaska 1970).

**35.** *Froelicher v. Hadley,* 442 P.2d 51, 53 (Alaska 1968).

**36.** *Patrick v. Sedwick,* 413 P.2d 169, 179 (Alaska 1966).

**37.** *Compare Continental Ins. Co. v. United States Fidelity and Guar. Co.,* 552 P.2d 1122, 1127 (Alaska 1976).

trial briefing, and involved a significant number of difficult and complex legal issues. We therefore conclude that the superior court did not abuse its discretion in awarding Northern attorney's fees above those called for under the schedule of Rule 82.

Affirmed.