The ALASKA GAY COALITION, a Nonprofit Organization, Appellant,

v.

George M. SULLIVAN, Bruce Staser and Municipality of Anchorage, Appellees.

No. 3083.

Supreme Court of Alaska.

May 5, 1978.

Lawrence J. Kulik, Sue Ellen Tatter, Anchorage, for appellant.

Peter C. Ginder, Asst. Municipal Atty., Richard Garnett, III, Municipal Atty., Anchorage, for appellees.

Craig M. Cornish, James S. Crane, Robert Krase and Robert E. Mintz, Anchorage, for American Civil Liberties Union, amicus curiae.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

## OPINION

BURKE, Justice.

In this appeal we are called upon to determine whether the Municipality of Anchorage's exclusion of the Alaska Gay Coalition from the 1976–77 *Anchorage Blue Book,* a government publication, denied that organization its constitutional rights to freedom of speech and association and equal protection of the law. The superior court ruled that the Municipality's action did not violate the Gay Coalition's constitutional rights. We reverse.

The 1976–77 *Anchorage Blue Book* is a paperback guide to services and organizations in the greater Anchorage area published by the Municipality of Anchorage. Although the publication primarily serves as a guide to public services and resources, it also contains information about many private organizations. The book's purpose is to provide Anchorage residents with a single source of information regarding public services, local government, recreational opportunities and crisis assistance. The cost of printing and publishing the guide was initially borne by the Municipality, with such costs to be recouped by sale of the booklet through commercial outlets. An earlier version of the guide, called simply *The Blue Book,* had been published in 1975 under the auspices of the former Greater Anchorage Area Borough.

Preparation of the 1976–77 *Anchorage Blue Book* (hereinafter referred to as the *Blue Book*) was handled jointly by the Municipality and the Anchorage Action Council, a federally-funded community organization, then directed by Lanie Fleischer. Most of the updated information for the *Blue Book* was gathered in February and March of 1976, primarily by Cheryl Jerabek, a VISTA volunteer with the Action Council. Ms. Jerabek contacted all of the groups which had been included in the earlier version of the *Blue Book* as well as many which had not previously been listed. Within the latter category was the Alaska Gay Coalition, which submitted a brief written description of the group's purposes and services. Appellee Bruce Staser, who until mid-April was Public Information Officer for the Municipality, assisted Ms. Jerabek by soliciting updated information from all of the departments and divisions of the Municipality. Mr. Staser also wrote and edited portions of the *Blue Book* relating to municipal services.

When all of the information had been compiled, a rough draft of the *Blue Book* was prepared by the graphics department of the Municipality. This draft included, in a section entitled "Women," the following entry submitted by the Gay Coalition:

Alaska Gay Coalition

P. O. Box 2488

Purpose: To develop, secure and maintain the civil liberties, rights and dignity of all homosexual and lesbian individuals, to represent the interest and goals of lesbians and homosexuals in Alaska; to educate the overall community about those goals and interests.

Services: Referral to related organizations; speakers available in the area of gay rights issues; public education; provide social and political personal support. Meetings every two weeks on Friday evenings. Programs developing as well as special meetings when necessary.

Fees: None.

Four copies of this first draft were distributed to Lanie Fleischer, Carolyn Gay, who had succeeded Bruce Staser as Public Information Officer for the Municipality, Paul Palmer, graphics and publications manager for the Municipality, and George Sullivan, Mayor of the Municipality.

Fleischer and Gay were generally considered the co-editors of the publication although the Mayor had final editorial control.

Upon receiving his copy of the first draft, Mayor Sullivan made a number of substantive and structural revisions in the draft, particularly in the section entitled "Women." He changed the title of this section to "Men's and Women's Organizations" and suggested the inclusion of several organizations which were not listed, such as the Lions and Kiwanis. As a space-saving measure, and in order to include additional organizations such as the ones he had suggested, the Mayor also directed that all of the verbiage describing the various groups' purposes and services be deleted, with the listings to consist only of names and telephone numbers. He further suggested that certain of the women's groups be deleted if necessary. At this time the Mayor also ordered that the reference to the Alaska Gay Coalition be deleted in its entirety.[1]

Following the Mayor's revisions, as well as other extensive revisions and some deletions by Fleischer, Gay and Palmer, a second draft of the *Blue Book* was prepared. This draft contained no reference to the Alaska Gay Coalition. After further revising, the second draft was sent to be printed.

On July 21, 1976, the Gay Coalition filed a complaint against Mayor Sullivan, Bruce Staser and the Municipality of Anchorage, and at the same time sought a temporary restraining order from the superior court restraining appellees from distributing copies of the *Blue Book*. The superior court granted the requested temporary order on July 29, 1976.

Trial of the action was conducted on August 26–27, 1976. The Coalition argued that appellees' action (1) violated its right to equal protection under the Fourteenth Amendment of the United States Constitution and art. I, sec. 1 of the Alaska Constitution, (2) denied both the Coalition and the public's right to freedom of speech and association, and (3) deprived the Coalition of procedural and substantive due process. In an oral opinion the superior court found against the Coalition on all issues, denying its request for damages, injunctive and declaratory relief.[2] This appeal followed.

The controlling and most significant issue in this case is whether the Mayor's action in deleting the Gay Coalition's entry from the *Blue Book* denied that group its right to freedom of speech and association under the First Amendment to the United States Constitution and art. I, sec. 5 of the Alaska Constitution.[3] Appellant contends that the *Blue Book* is a public forum and therefore the Municipality could not give some individuals access to that forum but exclude others based solely on the nature of their beliefs. Appellees deny that the *Blue Book* is a public forum. In the alternative, they

1. Appellee Bruce Staser, who at this time had become the Mayor's executive administrative assistant, had seen the rough draft before the Mayor and had himself put an "X" through the Coalition's entry. He did so because he felt that the Municipal Assembly did not want the Coalition listed in the publication.

2. Although the Coalition requested damages in its complaint, it does not appear that the group in fact sought a money recovery.

3. The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

This amendment is made applicable to the states by the Fourteenth Amendment. *Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697, 702 (1963).

Art. I, § 5 of the Alaska Constitution provides:

Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.

Freedom of speech and association are integrally related rights which both derive from the First Amendment. Exercise of one of these rights almost invariably implicates the other for each is a means toward accomplishment of the other. *See e. g., Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266, 279 (1972); *National Asso. for the A. C. P. v. Alabama*, 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488, 1498–99 (1958).

maintain that the Coalition's failure to show that harm resulted from deletion of its entry is fatal to its claim.

▆▆▆ The public forum doctrine as it relates to this case [4] can be briefly stated as follows: Once there exists a government-controlled forum for the dissemination of information and expression of ideas, the government cannot deny equal access to that forum based on content alone. This equality of access is compelled by both the First Amendment and the equal protection clause.[5]

Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone. [footnote omitted].

*Police Department v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212, 217 (1972). Although the government may not restrict access to a public forum based on content alone, it may, however, place reasonable restrictions on the "time, place and manner" of the exercise of expressive rights. *Id.* at 98, 92 S.Ct. 2286. *See also Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2302, 33 L.Ed.2d 222, 231 (1972); *Cox v. Louisiana,* 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471, 486 (1965); *Kovacs v. Cooper,* 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). In other words, while the government may reasonably regulate expressive activity, it may not censor such activity.

In the instant case, there is no question that the Gay Coalition was deleted from the *Blue Book* solely on the basis of the personal beliefs of its members. At trial, the Mayor gave several reasons for the deletion. First, he believed that the Coalition was primarily a political and lobbying group and that as such it did not belong in the publication, just as political organizations such as the Democrats and Republicans did not belong there. He felt that the group's political nature was inconsistent with the nonpolitical focus of the booklet. Second, the Mayor admitted to a personal aversion to homosexuality. Finally, he testified that he felt that state statutes against sodomy and incest made it improper for a government publication to include reference to a group such as the Coalition.[6]

▆▆▆ The trial court found that the major reason for the Mayor's action was the

4. This case does not involve the broader issue of the public's right to minimum access to a public forum but only a narrower equal access question. For a good discussion of both aspects of this doctrine see Note, "The Public Forum: Minimum Access, Equal Access, and the First Amendment," 28 Stan.L.Rev. 117 (1975).

5. The Fourteenth Amendment to the United States Constitution provides in relevant part:

No state shall . . . deny to any person within its jurisdiction the equal protection of the laws.

The state counterpart to the equal protection clause is in Art. I, § 1 of the Alaska Constitution.

6. In *Gay Lib v. University of Missouri,* 558 F.2d 848 (8th Cir. 1977), the United States Court of Appeals, Eighth Circuit, held that even if the University's formal recognition of a homosexual student organization would tend to "perpetrate" or "expand" homosexual behavior or increase "homosexual activities . . . includ[ing] sodomy," as indicated by the University's expert witnesses, that provided no legal justification for withholding formal recognition from the organization, where the record failed to demonstrate that the organization advocated present violation of state laws or of University rules or regulations. The court noted:

[M]any [United States] Supreme Court cases dealing with prior restraints and other First Amendment issues made clear that the restriction of First Amendment rights in the

political focus of the Coalition. In our view, this finding was clearly erroneous.[7] Numerous other political and lobbying groups were included in the *Blue Book* yet the Mayor did not find it necessary to delete any of them except appellant. Among these groups were the National Association for the Advancement of Colored People, the American Civil Liberties Union, the Sierra Club, and the Anchorage Tenants Union, to name but a few. Clearly there was no firm policy of excluding all political groups as intimated by the Mayor. It is apparent that the Gay Coalition was deleted from the *Blue Book* solely because it was a homosexual organization and not because the group's political focus was otherwise inconsistent with the type of organizations included in the publication. The only question we need resolve, therefore, is whether the *Blue Book* is a public forum to which appellant had a right of equal access.

In the majority of cases dealing specifically with the public forum issue, the question has been whether a particular place, rather than a publication, was a public forum. Public streets, sidewalks and parks were early designated public forums. *Mosley, supra; Hague v. Committee for Industrial Organization,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). Courts since then have found a wide variety of places to be public forums including municipal auditoriums,[8] a public school auditorium,[9] city-owned airports,[10] a state house rotunda,[11] public utility poles where use was specifically permitted by ordinance,[12] and a state-owned bus terminal.[13] In addition, limited public forums have been found when the state sponsors a one-time event and provides members of the public with an opportunity for expression. Thus, in *Toward A Gayer Bicentennial Committee v. R.I. Bicentennial Foundation,* 417 F.Supp. 632 (D.R.I.1976), the court found that when the state opened the Old State House for bicentennial activities, it had created a public forum during that period.[14]

While most cases have dealt with geographical public forums, there is authority

present context may be justified only by a far greater showing of a likelihood of imminent lawless action than that presented here. 558 F.2d at 854–55 [footnotes omitted]. Using language found in *Gay Alliance of Students v. Matthews,* 544 F.2d 162, 164 (4th Cir. 1976), the court described the organization as follows: [I]t is, at most, a "pro-homosexual" political organization advocating a liberalization of legal restrictions against the practice of homosexuality and one seeking, by the educational and informational process, to generate understanding and acceptance of individuals whose sexual orientation is wholly or partly homosexual. 558 F.2d at 856. It appears that the Alaska Gay Coalition could be similarly described.

7. A trial court's finding of fact will be set aside by this court only if it is clearly erroneous. Rule 52(a), Alaska R.Civ.P. A finding of fact is clearly erroneous when, though there may be evidence to support it, the reviewing court is left with the definite and firm conviction on the entire record that a mistake has been made. *Chugach Electric Ass'n v. Northern Corp.,* 562 P.2d 1053, 1060 n.22 (Alaska 1977).

8. *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

9. *National Socialist White People's Party v. Ringers,* 473 F.2d 1010 (4th Cir. 1973).

10. *Chicago Area Military Project v. City of Chicago,* 508 F.2d 921 (7th Cir. 1975), *cert. denied,* 421 U.S. 992, 95 S.Ct. 1999, 44 L.Ed.2d 483 (1975); *Kuszynski v. City of Oakland,* 479 F.2d 1130 (9th Cir. 1973).

11. *Reilly v. Noel,* 384 F.Supp. 741 (D.R.I.1974).

12. *Dulaney v. Municipal Court for San Francisco J.D.,* 11 Cal.3d 77, 112 Cal.Rptr. 777, 520 P.2d 1 (1974).

13. *Wolin v. Port of New York Authority,* 392 F.2d 83 (2d Cir. 1968), *cert. denied,* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968).

14. Public forums have been limited to certain types of expression also. Thus, for example, in *Albany Welfare Rights Organization v. Wyman,* 493 F.2d 1319 (2d Cir. 1974), *cert. denied, sub nom. Lavine v. Albany Welfare Rights Organization,* 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) and *Unemployed Workers Union v. Hackett,* 332 F.Supp. 1372 (D.R.I. 1971), the courts found that a county welfare office waiting room and a state unemployment office, respectively, were appropriate places for the dissemination of information regarding welfare and unemployment issues, though not necessarily for any and all expression. Similarly, the Rhode Island Old State House was open only to expression relating to bicentennial

for the proposition that a publication may be considered a public forum to which equal access must be afforded. In *Radical Lawyers Caucus v. Pool*, 324 F.Supp. 268 (W.D. Tex.1970), the court held that the Texas Bar Journal, conceded to be an agency of the state, could not constitutionally refuse the plaintiff's political advertisement when it regularly accepted commercial advertising and where there was evidence that political ads had been accepted in the past. Similarly, in *Lee v. Board of Regents of State Colleges*, 441 F.2d 1257 (7th Cir. 1971), it was held that a state campus newspaper, which was open to commercial and some political and service advertisements, could not constitutionally reject other political advertisements solely because of their content. While neither of these cases specifically designated the publications as public forums, implicit in them was a finding that such a forum existed since the requirement of equal access is predicated on the existence of a public forum. *See also Mississippi Gay Alliance v. Goudelock*, 536 F.2d 1073, 1080 (5th Cir. 1976) (dissenting opinion).[15]

■ While examination of the public forum cases to date provides no clear precedent upon which we can rest our decision in this case, we have little trouble in designating the *Blue Book* a public forum. There is no question that the publication is "public," as it was prepared and published by the Municipality. Thus we are not concerned with the problem of the public's right to access to private forums of a quasi-public nature.[16] Nor are we faced here with the situation where exercise of First Amendment rights may interfere with the purpose and normal use of a public facility.[17] The *Blue Book* was clearly an appropriate place for the communication of the type of information submitted by the Gay Coalition.[18] Even more than parks, airport terminals and the like, the very purpose of the booklet was communication. The publication was intended to provide a vehicle for the dissemination of information regarding public and private services and organizations in the Anchorage area. The groups listed represented a variety of viewpoints and interests and the *Blue Book* served as a means by which members of the community could discover the existence of others with similar views and interests. In short, the *Blue Book* was designed for and dedicated to expressive and associational use and therefore, once it was opened for such use, the government could not deny appellant access to it based solely on the content of its beliefs.

themes. *See also Bonner-Lyons v. School Committee of City of Boston*, 480 F.2d 442 (1st Cir. 1973) (where public school distribution system opened as forum for anti-bussing materials, access must also be given to pro-bussing groups).

15. In *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), the Supreme Court held that under the First Amendment guarantee of freedom of the press, newspaper editors could not be compelled to print news or viewpoints which they did not wish to include. It is unclear whether this decision would apply to government-run publications and if so, whether the rationale would extend to the inclusion or exclusion of advertising material. The dissent in *Goudelock, supra*, discusses this point at some length. *See also* Justice Douglas' concurring opinion in *Lehman v. City of Shaker Heights, infra; Bigelow v. Virginia*, 421 U.S. 809, 829, 95 S.Ct. 2222, 2236, 44 L.Ed.2d 600, 616 (1975). In any event, appellees do not assert that *Miami Herald* supports the Mayor's right to delete appellant from the *Blue Book*.

16. *See e. g., Marsh v. Alabama*, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (First Amendment rights may be exercised in privately owned "company town" where such town was the functional equivalent of a municipality) and *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976) (No right to freedom of expression in privately owned shopping center).

17. *E. g., Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966) (state could properly prohibit peaceful demonstrations on jail grounds); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (state may restrict picketing in or near a courthouse).

18. Although the Coalition originally submitted a description of its purpose and activities, all that the group ultimately sought was to have at least its name and post office box listed in conformity with the other listings in the *Blue Book* section entitled "Men's and Women's Organizations."

Appellees contend, however, that the *Blue Book* does not constitute a public forum for two reasons. First, they argue that the *Blue Book* is simply an informational booklet, the tenor of which is "bland, nonadvocative and carefully winnowed of any partisan flavor." They maintain that since it does not provide a vehicle for the interchange of partisan views, ideas and opinions, the *Blue Book* does not "partake of the essential attribute of a public forum." In support of this position, appellees point to cases such as *Wolin v. Port of New York Authority, supra* n.13, in which the court looked to see whether the bus terminal-forum was an appropriate place for the expression of "views on issues of political and social significance." 392 F.2d at 89. They argue that an examination of public forum cases reveals that such forums were found only in those situations where there was a partisan exchange of views and opinions.

■ We find this argument unpersuasive. With a few carefully limited exceptions,[19] the First Amendment protects all forms of speech, both bland and partisan. It enables the soapbox orator to give a speech in the park free from unreasonable government intrusion, the newspaper to criticize official action at even the highest levels without fear of reprisal, and the pharmacist to advertise that he will sell " 'the X prescription drug at the Y price.' " *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council,* 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346, 358 (1976).[20] The informational speech at issue here is as significant under our constitutional scheme as more political or partisan speech. In our view, there is but a short step between the dissemination of in-

formation such as that contained in the *Blue Book* and the exchange of views and ideas. The dissemination of information is often an invitation to discussion, and as such, it is a necessary and important part of the discussion process itself. Were we to draw the line that appellees suggest, we would be in effect thwarting the very process of communication which the First Amendment is designed to protect. Moreover, as the United States Supreme Court has stated, "[E]ven if the First Amendment were thought to be primarily an instrument to enlighten public decisionmaking in a democracy, we could not say that the free flow of information does not serve that goal." *Virginia State Board of Pharmacy, supra* at 765, 96 S.Ct. at 1827 [footnote omitted].

■ Appellees' argument is flawed in another respect as well. Public forums are not designated such because they are designed to provide a vehicle for partisan expression; rather, they are so called because they are appropriate arenas for people to exercise their constitutional rights of expression and association. In many instances, forums are not designed to provide a vehicle for expression at all, obvious examples being streets and bus terminals, yet they are considered public forums because they are appropriate places for speech activity. In other cases, it is the fact that the government has opened a forum for speech activity in general that is determinative of rights of access rather than use of the forum as a vehicle for the exchange of partisan viewpoints. Thus, for example, in *Dulaney v. Municipal Court for San Francisco J.D.,* 11 Cal.3d 77, 112 Cal.Rptr. 777, 520 P.2d 1 (1974), a San Francisco ordinance made utility poles available for the posting

---

19. Certain types of speech such as obscenity or "fighting words" are not protected by the First Amendment and may be punished in the proper circumstances. For a discussion of these limitations on freedom of expression see *Marks v. City of Anchorage,* 500 P.2d 644 (Alaska 1972); *Anniskette v. State,* 489 P.2d 1012 (Alaska 1971).

20. In *Virginia State Board of Pharmacy,* the Supreme Court held that First Amendment pro-

tection is extended to the advertisement of prescription drug prices. Other cases have held that other forms of commercial speech are similarly protected. *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (advertising by attorneys); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (real estate "For Sale" signs).

of " 'any advertisement, bill, notice, card, sign, or advertising device . . . .' " *Id.,* 112 Cal.Rptr. at 783, 520 P.2d at 7. The City had thereby made its utility poles available for printed expression of all types, not simply partisan expression, and it was this fact, *i. e.,* that a vehicle for communication had been opened, that led the court to conclude that a public forum had been created. Nowhere does the court indicate that a forum must be dedicated to the expression of political or socially significant views before it can be considered a public forum.

Appellees also argue that under *Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), the *Blue Book* does not constitute a public forum because the Municipality never intended it to be a forum for the espousal of political and philosophical views. In *Lehman,* a candidate for state office challenged a city transit system's refusal to accept his campaign advertisement under a uniform policy of not accepting political advertising in its commuter car advertising space. The Supreme Court split three ways on the question of whether the transit system had thus deprived the candidate of his First Amendment rights. Four justices found that no public forum had been created and that the city's policy reasonably furthered legitimate goals, one of which was to minimize the risk of imposing on captive commuter audiences. Justice Douglas concurred solely on the ground that the commuters were a captive audience who had a right to be free of the intrusion of political advertisements. Four justices dissented on the basis that the city had opened a public forum and therefore could not deny access to its transit car advertising space based on content alone.

*Lehman* is inapposite to the instant case. There the alleged forum was but part of a larger commercial venture, the major purpose of which was to provide transportation. Here we are dealing with an informational booklet, the sole purpose of which was to provide information to the public. In that case, the court was concerned with transit car advertisement's imposing on a captive audience. Clearly, the readers of the *Blue Book* need not look at a particular

listing if they do not wish to. Finally, in *Lehman* the Court was faced with an evenly applied advertising policy which at least arguably advanced reasonable legislative objectives. Such is not the case here. In this case we need not decide the harder question of to what extent the government may reasonably limit the scope and use of communicative forums it has established. Rather we are presented with a situation where the government has denied a group the right to access to an informational booklet solely on the basis of its particular beliefs. The factual and policy considerations which led the *Lehman* plurality to conclude that the transit system advertising card space was not a First Amendment forum simply are not present here and that case thus has little bearing on our determination.

■ Appellees have advanced one other argument in support of their position that there has been no abridgement of appellant's First Amendment rights in this case. Stated briefly, they contend that the Coalition's failure to show that actual harm resulted from deletion of its entry in the *Blue Book* is fatal to its First Amendment claim. As a corollary to this, they maintain that the availability of alternative means of communication is a factor bearing on the absence of concrete injury to appellant's First Amendment interests.

■ Appellees' contention is without merit. It is axiomatic that freedom of speech and the correlative freedom of association are fundamental rights which lie at the foundation of our system of government. In *Cohen v. California,* 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284, 293 (1971), the United States Supreme Court expressed the significance of the First Amendment as follows:

> The constitutional right of free expression is powerful medicine in a society as diverse and populous as ours. It is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into

the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests. [citation omitted].

As these words make clear, the First Amendment is designed to ensure that individuals are able to speak (and associate) free from unnecessary government restraint. Inherent in its mandate is the notion that it is the *suppression* of speech *in itself* which is the evil to be avoided for such suppression necessarily impairs the right to speak freely. Any further showing of adverse consequences flowing therefrom is unnecessary. Moreover, contrary to appellees' suggestion, the availability of alternative means of communication does not mitigate the harm resulting from government restraint of speech. As the Supreme Court has stated, "[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. Irvington,* 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155, 166 (1939).

The cases cited by appellees do not convince us otherwise. Appellant has not sought money damages. All that it seeks is the right to fair treatment and the "liberty of expression in appropriate places." The Municipality denied the Gay Coalition these basic rights. In our view, that was injury enough.[21]

One final point raised by appellees merits discussion. Appellees have emphasized that because of space limitations it was possible to list in the *Blue Book* only a fraction of the organizations existing in the Anchorage area and they imply that this fact in some

way justifies exclusion of the Gay Coalition. We are not persuaded by this argument for in finding the *Blue Book* to be a public forum we have not ignored this factor. When the Municipality decided to publish a limited informational guide to public and private local resources, it did not thereby assume the obligation of providing space to every possible group in Anchorage seeking a listing. Had the Municipality deleted groups at random or used criteria not related to the nature of particular organizations, constitutional violations may not have resulted. In deleting the Alaska Gay Coalition from the *Blue Book,* however, appellees denied that group access to a public forum *based solely on the nature of its beliefs.* In so doing, they violated appellant's constitutional rights to freedom of speech and association and equal protection under the law.[22]

It is our understanding that copies of the 1976–77 *Anchorage Blue Book* are still available for sale to the public. In accordance with our opinion in this case, we hold that further distribution of the publication in its present form constitutes a continuing violation of appellant's constitutional rights. The case is remanded to the superior court with instructions to forthwith order that appellees and their agents be immediately enjoined from further distribution of the 1976–77 *Anchorage Blue Book.*

---

**21.** This is not to say, of course, that the Coalition—an organization with few funds that represents a still unpopular minority—was not in fact harmed by exclusion of their entry in the *Blue Book.* As counsel for the Coalition noted at trial:

> Obviously if I were representing at this time the League of Women Voters I'd be hard pressed to show very much damage that the

league would suffer by not being in the Anchorage Blue Book, however, I don't represent such a popular group. I represent the Gay Coalition. And these people take whatever forum they can get and when they can get it. This is a valuable forum to them.

**22.** Our disposition of this case on the above ground makes it unnecessary for us to reach the other issues raised by appellant.