652 F.2d 1286
 107 L.R.R.M. (BNA) 3026
 PERRY LOCAL EDUCATORS' ASSOCIATION, Evelyn E. Waddell and
Judith M. Dietrich, Plaintiffs-Appellants,
v.
William HOHLT, et al., Defendants-Appellees.
 No. 80-1420.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 4, 1980.
Decided June 24, 1981.
Rehearing and Rehearing En Banc Denied August 14, 1981.
 
 Lawrence M. Reuben, Indianapolis, Ind., for plaintiffs-appellants.
 Richard J. Darko, Louis H. Borgmann, Indianapolis, Ind., for defendants-appellees.
 Before FAIRCHILD, Chief Judge, WISDOM, Senior Circuit Judge,* and CUMMINGS, Circuit Judge.
 WISDOM, Senior Circuit Judge.
 
 
 1
 This case requires us to consider the constitutionality of a collective bargaining agreement between a teachers' union and a school board that both permits the union to use the school district's internal mail system and compels the school district to deny that right to competing unions. The plaintiffs, an insurgent union and two of its members, contend that their exclusion from the school mail system violates their first and fourteenth amendment rights. The district court disagreed. We reverse.
 
 I.
 
 2
 The facts, as they appear in the parties' pleadings and affidavits, are not in dispute. The Metropolitan School District of Perry Township in Marion County, Indiana, operates a public school system made up of thirteen separate schools. Each school building is equipped with a set of mailboxes or mail slots each labelled with the name of a teacher at the school. Inter-school delivery by school employees permits messages to be delivered rapidly to every teacher in the district. The main function of this internal mail system is to transmit official messages among the teachers and between the teachers and the school administration. That is not its only function, however, for the present collective bargaining representative of the teachers in that school district, the Perry Education Association (PEA), also has access to the system for its own purposes.
 
 
 3
 Until 1978 the school district evidently had no firm policy on the use of the internal mail system by teachers' unions; both PEA and a minority union, the Perry Local Educators Association (PLEA), had access at least to the mailboxes, if not to the inter-school delivery system. In 1977, however, PLEA challenged PEA's status as de facto bargaining representative of the Perry Township teachers by filing an election petition with the Indiana Education Employment Relations Board. PEA prevailed in the election and was formally certified as exclusive bargaining representative. In anticipation of continuing opposition from PLEA, PEA negotiated a labor contract designed to cement its status as bargaining representative. In that contract, the school board (1) guaranteed PEA's access to the teachers' mailboxes, (2) permitted it to use the inter-school delivery system to the extent that the school district incurred no extra expense by such use, and (3) promised to deny those rights to any other "school employee organization" a term of art defined by Indiana law to mean "any organization which has school employees as members and one of whose primary purposes is representing school employees in dealing with their employer".[1] Effective in July 1978, the contract was renewed with these same provisions upon its expiration in 1980, and it is presently in force.
 
 
 4
 PEA's privilege is subject to certain obvious limitations. Because the contractual prohibition extends only to competing unions, PEA's letters and broadsides are not the only unofficial communications permitted to flow through the internal mail system. Teachers use the system to send purely personal messages. The school district allows outside organizations to use it with the approval of any building principal. Local parochial schools, church groups, YMCA's, and Cub Scout units use the system. Furthermore, the privilege extends only to use of the mail system; it does not prevent PLEA from using other school facilities to communicate with teachers. As with PEA, members of PLEA may post notices on school bulletin boards (where available); may distribute written material in the teachers' lounge; may speak with teachers during luncheon and free periods; may, with prior approval of the building principal, make announcements on the public address system; and, apparently, may freely hold meetings on school property after school hours. Finally, we may assume for purposes of this appeal that Indiana law would prevent PEA from using the mail system during the period immediately preceding an inter-union election.[2]
 
 
 5
 PLEA and two of its members filed this action under 42 U.S.C. § 1983 (1976) against PEA and the individual members of the Perry Township School Board. They contend that their exclusion from the internal mail system violates their first amendment and equal protection rights, and they seek injunctive and declaratory relief and damages.[3] Upon cross-motions for summary judgment, the district court gave judgment for the defendants. Quoting Connecticut State Federation of Teachers v. Board of Education Members, 538 F.2d 471, 481 (2d Cir. 1976), the court held that "the restrictions placed upon the use of facilities not open to the general public, designed to transmit communications of limited public interest and supplemented by numerous alternative means of communication by PLEA members are 'so inconsequential that ... (they) cannot be considered an infringement of First Amendment rights of free speech' ". Applying rational basis scrutiny to the plaintiffs' equal protection claim, the court found, citing Memphis American Federation of Teachers Local 2032 v. Board of Education, 534 F.2d 699 (6th Cir. 1976), that the exclusive access policy was rationally related to the goal of preserving labor peace within the school system.
 
 
 6
 From this holding, plaintiffs appeal.
 
 II.
 
 7
 The plaintiffs' constitutional contentions arise from the confluence of two developments of relatively recent vintage: the rapid growth of collective bargaining in the public sector in the last two decades, and the erosion of the notion that public employment is a "privilege" to which some constitutional guarantees may be inapplicable.[4] We therefore have not had occasion to consider the merits of any similar claims before,[5] and none of the Supreme Court cases on the constitutional law of public sector labor relations is directly applicable.[6] Still, the district court had authority for rejecting the plaintiffs' claims. Our research discloses ten cases fairly on point, including two decided by federal Courts of Appeals, five decided only at the district court level, and three decided by state appellate courts. All but one, a district court opinion, rejected such claims.[7] Indeed, many of these cases upheld exclusive access policies considerably broader than the one followed by the Perry Township school board. For example, the two leading cases, Connecticut State Federation of Teachers v. Board of Education Members, 538 F.2d 471 (2d Cir. 1976) (Connecticut SFT ), and Memphis American Federation of Teachers Local 2032 v. Board of Education, 534 F.2d 699 (6th Cir. 1976) (Memphis AFT ), upheld grants to a majority union of an exclusive right to use school meeting facilities and bulletin boards, as well as the internal mail system.
 
 
 8
 We are, of course, not bound by these cases, and their reasoning fails to persuade us. We hold that when the Perry Township school board opens its internal mail system to PEA but denies it to PLEA, it violates both the equal protection clause and first amendment as incorporated into the fourteenth.
 
 
 9
 To help place the issue in context, we begin by noting that similar behavior by a private employer subject to the National Labor Relations Act (NLRA)[8] would constitute an unfair labor practice. NLRB v. Magnavox Co., 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358 (1974), struck down an employer's rule, authorized by its collective bargaining agreement, that prohibited employees from distributing literature to each other on the business premises and gave the incumbent union exclusive access to in-plant bulletin boards. The Court reasoned that the employees' right to criticize or to oppose a union, guaranteed by § 7 of the NLRA, implies that they have a nonwaivable right effectively to disseminate their opinions to other employees while on the business premises. As a corollary, the union's adversaries must have " 'equal access to and communication with their fellow employees' ". 415 U.S. at 326, 94 S.Ct. at 1102, quoting NLRB v. Mid-States Metal Products, Inc., 403 F.2d 702, 705 (5th Cir. 1968). Although Magnavox and the cases following it to date involved discriminatory bans on leafleting, posting of notices, or meeting on company property,[9] the principle of equal access established in Magnavox would seem applicable to a discriminatory grant of access to an employer's internal communications system.[10] With respect to communications relating to "mutual aid or protection" within the meaning of § 7 a term that has been interpreted broadly[11] an employer therefore may not open one particularly effective channel of communication to certain employees or members of one labor organization and deny it to others.
 
 
 10
 The teachers of the Perry Township Schools, however, as employees of a municipality, are not covered by the NLRA,[12] and the Indiana Education Employment Relations Board, which administers the analogous Indiana statute governing labor relations in Indiana public school systems, has ruled that a school district may, as a matter of state law, grant a majority union the exclusive right to use school facilities to communicate with teachers. Pike Independent Professional Educators, No. U-76-16-5350 (May 20, 1977).[13] Of course, we do not sit to judge the wisdom of that state policy, but only to ensure that it falls within the limits prescribed by the Constitution. "(T)he First Amendment is not a substitute for the national labor relations laws." Smith v. State Highway Employees Local 1315, 411 U.S. 463, 464, 99 S.Ct. 1826, 1827, 60 L.Ed.2d 360 (1979) (per curiam).
 
 
 11
 Still, it will not do to say, as some courts have said when faced with similar constitutional claims, that because this case involves the government only in its role as employer, it should be subject only to the constitutional restraints that would apply to a similarly situated private employer that is to say, none.[14] That amounts to an argument that state action is not implicated when the government acts in a proprietary capacity, an argument that has lost favor in the courts.[15] Indeed, the constitutional law of public sector labor relations is today a large and flourishing field. The due process clause limits the government's power to fire employees without a hearing,[16] the equal protection clause limits who may be employed and how employees may be hired and fired,[17] and the first amendment places a wide variety of restrictions on government labor practices. For example, the government may not forbid its employees to join a union,[18] compel them to finance political or ideological advocacy by their collective bargaining representative,[19] refuse to permit teachers other than union representatives to speak at open school board meetings,[20] fire employees solely because they publicly or privately criticize the government,[21] condition certain types of employment on affiliation with the political party in power,[22] refuse employment to members of the Communist Party,[23] require employees to affirm belief in God,[24] or require them to file affidavits listing the private organizations to which they belong.[25] Of course, "it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general". Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Thus, the government's interest in conducting its operations efficiently will justify such restrictions on the first amendment rights of its employees as are reasonably necessary to that end.[26] Nevertheless, these cases demonstrate that the first amendment and the equal protection clause apply with full force to the government in its role as employer.
 
 A.
 
 12
 The first step in constitutional analysis is to ascertain the applicable standard of review. The cases that have rejected constitutional challenges to similar exclusive access policies did so largely because they did not scrutinize the schools' justifications for those policies. Memphis AFT, for example, held that such a policy does not implicate the first amendment rights of the members of the minority union at all. Asserting that the policy neither regulated "the content or the subject matter of speech in the schools" nor "censored (nor) promoted a particular point of view", the court implicitly applied a right/privilege distinction to hold that because teachers have no absolute right of access to the mail system, the school board could open it to some teachers but not others without justification or limitation under the first amendment. 534 F.2d at 702. By contrast, Connecticut SFT recognized that an exclusive access policy may interfere with constitutionally-protected speech by the minority, but held that such interference does not violate the first amendment. Observing that the schools' communications facilities were not a public forum, that the minority union had alternative ways to communicate with teachers, and asserting that the minority's communications were of "limited public interest", the court ruled that those factors combined to render the interference with the minority's first amendment rights de minimis and negligible. 538 F.2d at 482. Equal protection scrutiny was no more exacting. Because the access restriction did not, in the view of the Memphis AFT court, implicate the first amendment rights of the minority union members or discriminate against a suspect class, the court held that the exclusive-rights policy had to pass only the superficial rational basis test. 534 F.2d at 703.[27]
 
 
 13
 With deference, we suggest that both Memphis AFT and Connecticut SFT erred by confusing the constitutional standards applicable to a rule that evenhandedly excludes all private communications from a particular government facility with the standards applicable to a rule that grants access to certain speakers or certain viewpoints and denies access to others. A challenge by an excluded speaker to the former sort of rule is a claim for absolute access; a challenge to the latter sort is a claim for equal access. An imprecise terminology makes it easy to confuse the two. Convention has established the term "public forum" to denote a facility that may not constitutionally be closed to all private expression, but the absence of a natural phrase to describe a facility that the government may not open only to certain speakers or viewpoints has led some courts to use the same or confusingly similar phrases in that context as well.[28] That is unfortunate, for the interests at stake in the two situations, and hence the appropriate standards of review, differ greatly.
 
 
 14
 Discriminatory treatment of speech on the basis of its content or on the basis of the identity of the speaker usually requires rigorous scrutiny because it presumptively violates the first amendment's primary and overriding proscription against censorship. Censorship, broadly defined as an attempt by the government to suppress the expression of disfavored points of view by private individuals, is a relative concept; it is defined by reference to the opportunities for expression open to favored or neutral viewpoints.[29] Contrary to Memphis AFT, it may easily take the form of amplifying favored or neutral speech, rather than of stifling the disfavored.
 
 
 15
 (A)bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content....
 
 
 16
 Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more conventional views. And it may not select which issues are worth discussing or debating in public facilities. There is an "equality of status in the field of ideas," and the government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking to some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone.
 
 
 17
 Police Department v. Mosley, 408 U.S. 92, 95-96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). It is therefore irrelevant whether the Perry school board's access policy is characterized as discriminatorily opening a new channel of communications to PEA or discriminatorily closing a preexisting channel to PLEA. The essential issue is whether the discrimination is justifiable; the same standard of scrutiny applies in either case.
 
 
 18
 The standard applicable to this case is a high one. Despite the sweeping language of Mosley quoted above, other Supreme Court cases demonstrate that it is not invariably true that the government may never discriminate among constitutionally protected speech on the basis of its content or on the basis of the speaker, nor even that all such discrimination must always be scrutinized with equal strictness. Because a majority of the Court were unable to agree on any one rationale in some of these cases, it is not always easy to determine the appropriate standard of review. Even interpreting the cases in the way most favorable to the defendants, however, they require rigorous scrutiny to be applied here. Although not always made explicit, one of the most important factors in determining the appropriate standard is the extent to which a given restriction has the effect of favoring the expression of a particular point of view on an identifiable issue more than would a content-and speaker-neutral restriction or no restriction at all.[30] The restriction challenged here does substantially favor one viewpoint in that sense, and so it is valid only if it is "finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized". Carey v. Brown, 447 U.S. 455, 461-62, 100 S.Ct. 2286, 2290-91, 65 L.Ed.2d 263 (1980).
 
 
 19
 The decisive importance of viewpoint neutrality is illustrated by the cases dealing with so-called "subject matter restrictions": content discrimination based on the subject matter of expression in a particular setting.[31] In both Greer v. Spock, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976), and Lehman v. City of Shaker Heights, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion), the Court applied a relatively deferential standard of review to rules forbidding political expression in, respectively, a military base and a municipal bus system; so too in Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion), which involved a zoning ordinance that was particularly restrictive for theatres exhibiting non-obscene but sexually explicit films. By contrast, the Court scrutinized other subject matter restrictions much more stringently in Mosley and Carey, both of which involved ordinances banning all but labor picketing in certain areas, as well as in Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), which involved an administrative order prohibiting public utilities from including in their monthly bills to customers any inserts discussing "controversial issues of public policy". These two sets of cases may be reconciled by noting that the stricter standard of review was applied in cases where the restriction was not viewpoint-neutral in the sense defined above.[32] The predictable and intended effect of the order challenged in Consolidated Edison Co. was to prevent electrical utilities from extolling the virtues of nuclear power, and the labor exceptions involved in Mosley and Carey favored labor against management more than would a complete prohibition on picketing. By contrast, the restrictions involved in Greer and Lehman had no readily discernible tendency to favor particular types of political candidates or political doctrines; and the plurality opinion in Young stressed that the challenged zoning restriction on theatres exhibiting sexually explicit films was neutral with respect to the ideas or viewpoint conveyed by those films. 427 U.S. at 70, 96 S.Ct. at 2452.[33] Viewpoint-neutrality also helps explain why speech restrictions keyed to the identity of the speaker are always scrutinized strictly: they almost invariably are not neutral with respect to the viewpoints they tend to disfavor. Indeed, the fact that the Supreme Court has never distinguished sharply between speaker discrimination and impermissible subject matter restrictions, as illustrated by the passage from Mosley quoted above, itself tends to indicate that the same fundamental evil underlies both.[34]
 
 
 20
 This is not to say that lack of viewpoint-neutrality is a necessary condition for vigorous scrutiny of content or speaker discrimination; the Speech Clause guards other values with comparable intensity.[35] But it is at least a sufficient condition. No case has applied any but the most exacting scrutiny to a content or speaker restriction that substantially tended to favor the advocacy of one point of view on a given issue. The access policy adopted by the Perry schools, in form a speaker restriction, favors a particular viewpoint on labor relations in the Perry schools in just such a manner: the teachers inevitably will receive from PEA self-laudatory descriptions of its activities on their behalf and will be denied the critical perspective offered by the PLEA. It must therefore be rigorously scrutinized.
 
 
 21
 Although this discussion is couched in terms of the first amendment, the same standard of review may be derived from the equal protection clause. Equal protection analysis may broadly be said to fall into a familiar two-tiered pattern: government classifications that impinge on fundamental rights and classifications along suspect lines must be closely tailored to meet a compelling state interest, but other classifications need only be rationally related to a legitimate state interest. E. g., San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 16-17, 93 S.Ct. 1278, 1287-88, 36 L.Ed.2d 16 (1973). Because free speech is a fundamental right, and because discrimination between speech or speakers, to the extent that it operates as a form of censorship, implicates that right, the fundamental rights strand of strict scrutiny applies to such discrimination. The peculiar identity of equal protection and first amendment analyses in differential access cases follows logically from the explicit constitutional designation of speech as fundamental and from the fact that the first amendment's proscription against censorship is itself simply a specialized equal protection guarantee.[36] Thus, although Mosley evidently was the first case explicitly to apply the equal protection clause to differential access cases, the analytic tools of equal protection strict scrutiny the requirements of a relatively important state interest, a close fit between end and means, and use of the least restrictive alternative were applied to content discrimination under the aegis of the first amendment long before then.[37]
 
 
 22
 In principle, of course, the stringency with which these tools should be applied could vary between the first amendment and equal protection clauses. The strictness of the scrutiny applied under the fundamental rights strand of equal protection does in fact vary in different contexts; there seems to be more than a verbal difference between the "necessary to promote a compelling state interest" test, applied to certain restrictions on the fundamental right to equal treatment in the voting process,[38] and the "closely tailored to an important state interest" test, applied by Carey, Mosley, and Consolidated Edison Co. to non-viewpoint-neutral content and speaker discrimination. It should not be surprising that the strictness of fundamental rights scrutiny may vary with the particular right in question, just as the strictness of the scrutiny applied under the suspect classification strands may vary as the classification is fully suspect, such as race, or only semi-suspect, such as gender.[39] But, as also illustrated by the passage quoted from Mosley, the Supreme Court has alluded to the first amendment and the equal protection clauses almost indiscriminately in cases involving discrimination in access to communications facilities.[40] In this case, therefore, there is no substantial difference between the standards of review required by those two constitutional provisions.[41]
 
 
 23
 It is irrelevant to application of the viewpoint-neutrality principle that the school district's internal mail system is not a public forum in the exact sense of the term. That is, we may assume that the Constitution would not prohibit the school district from closing its internal mail system to all unofficial communications if it chose. The public forum doctrine is a manifestation of the first amendment's independent proscription against government regulation that unnecessarily constricts opportunities for expression, even if viewpoint-neutral. If viewpoint-neutrality is an equal protection guarantee, the public forum doctrine is its substantive due process analogue.[42] But while content neutrality is an all-pervasive restriction, the public forum doctrine, because of its more sweeping consequences and potentially limitless application, has been carefully restricted to guarantee unofficial access only to government property or facilities of a sort that traditionally have been open to public expression, Greer v. Spock, 424 U.S. 828, 835-36, 96 S.Ct. 1211, 1216, 47 L.Ed.2d 505 (1976), quoting Hague v. Committee for Industrial Organization, 307 U.S. 496, 515-16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.), or whose normal use plainly will not be interfered with by such expression, Grayned v. City of Rockford, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972); Brown v. Louisiana, 383 U.S. 131, 142, 86 S.Ct. 719, 724, 15 L.Ed.2d 637 (1966) (plurality opinion).
 
 
 24
 Many cases demonstrate that the obligation of viewpoint neutrality applies to discriminatory access restrictions whether or not the facility could be completely closed to unofficial communications. For example, a school classroom is not a public forum, but Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 510-11, 89 S.Ct. 733, 738-39, 21 L.Ed.2d 731 (1969), struck down a rule prohibiting students from wearing armbands in protest of the Vietnam War in part because the school did not prohibit the wearing of other symbols of political significance. Greer v. Spock, 424 U.S. 828, 838-39, 96 S.Ct. 1211, 1217-18, 47 L.Ed.2d 505 (1976), upheld a general access restriction applied to prohibit a politician from speaking on a military base, but the Court took care to note that the rule had been applied evenhandedly to all political speakers. In particular, courts have not hesitated to apply the viewpoint-neutrality principle to public schools' internal mail systems and other school facilities even though they are not public forums outside the context of school labor relations, at least. Bonner-Lyons v. School Committee, 480 F.2d 442 (1st Cir. 1973), for example, forbade a school board from disseminating to students and parents messages critical of forced busing unless proponents were given equal access to the schools' message distribution system. National Socialist White People's Party v. Ringers, 473 F.2d 1010 (4th Cir. 1973) (en banc), required a school board to rent its school auditorium to a racially discriminatory political party because the auditorium was available to other private organizations.[43] We see no reason why the first amendment and equal protection rights of the members of a legitimate teachers' union, or of other teachers, should be weaker than the rights of Klansmen.
 
 
 25
 Connecticut SFT asserted that a low standard of scrutiny should apply to a minority union's equal access claim in part because its communications were thought to be of "limited public interest". 538 F.2d at 481. Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977), contradicted that statement in discussing the comparative first amendment rights of members and non-members of a majority union in the course of analyzing the constitutionality of an agency shop arrangement in a public school system. First, it is doubtful, to say the least, that communications critical of the incumbent union or of school operations by a minority union or individual teachers really are of limited public interest; Abood held it a "truism" that "because public employee unions attempt to influence government policymaking, their activities and the views of members who disagree with them may properly be termed political". 431 U.S. at 231, 97 S.Ct. at 1797. More fundamentally, even if such communications could fairly be characterized as being of interest only to the teachers themselves, that fact is irrelevant. As Abood also pointed out, the Supreme Court has "never suggested that expression about philosophical, social, artistic, economic, literary, or ethical matters to take a nonexhaustive list of labels is not entitled to full First Amendment protection". Id. (footnote omitted). The first amendment does not enact Alexander Meiklejohn's Free Speech and its Relation to Self-Government any more than the fourteenth enacts Herbert Spencer's Social Statics. It is true that at least two recent opinions each by a badly divided Supreme Court look to a "two level" theory of the first amendment, in which certain communications protected by the first amendment in the sense that they cannot constitutionally be banned outright may nevertheless be prohibited from certain channels of communication on the basis of their content.[44] But both of those cases involved virtually idealess near-obscenity, on the fringe of first amendment protection. By contrast, PLEA's criticisms of PEA and its efforts to persuade teachers to enter its ranks and, ultimately, to influence school operations are, if not at the very apex of any hierarchy of protected speech, at least not far below it.
 
 
 26
 Finally, the fact that PLEA has alternative ways to communicate with the teachers does not weaken the applicable standard of review. The oft-cited general rule is that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place". Schneider v. State, 308 U.S. 147, 163, 60 S.Ct. 146, 151-52, 84 L.Ed. 155 (1939). Of course, if read for all it is worth, this statement is patently false; the effect of even the most innocuous time, place, or manner restriction is to do precisely that. But, properly interpreted, the Schneider rule does stand for an important truth: the existence of alternative channels of communication will not alone justify a restriction on one channel. Such a restriction must always have an independent justification; restrictions keyed to the speaker or to the content of the message delivered must still be scrutinized.[45] The only effect of the existence of alternative channels of communications is to lessen the weight of the state interest necessary to justify a restriction on a particular channel and only to the extent that other channels are as effective as the restricted channel.
 
 
 27
 The other channels of communication here available to PLEA, however, are not nearly as effective as the internal mail system. "The place of work is a place uniquely appropriate for dissemination of views concerning the bargaining representative and the various options open to the employees", NLRB v. Magnavox Co., 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358 (1974), and off-campus communication by PLEA to the teachers of Perry Township would either be expensive, if through the public mails, or cumbersome, if through mass telephoning. Its opportunities for communication on the school premises are also decidedly inferior to the internal mail system. Hand distribution of written materials and speaking with individual teachers are far more arduous and time-consuming; literature left in the teachers' lounge and bulletin board messages are more likely to be missed by persons not deliberately seeking them; bulletin board messages and public address announcements cannot convey much detail; and meetings on school property after school hours only permit PLEA to preach to the converted. Indeed, the defendants' attempt to justify the mail access restriction as necessary to ensure labor peace, discussed below, itself further demonstrates the inadequacy of these other methods of communication, for if PLEA's use of these methods does not threaten labor peace, that is only because they are less effective than the mail system in stirring up support for it. Because these methods are materially less effective than the mail system, their existence does not weaken the appropriate standard of review.
 
 B.
 
 28
 Given that the exclusive access policy must be closely tailored to an important state interest, the defendants' attempts to justify it must be rejected. Their arguments fall into two categories. First, they assert that discrimination in favor of the incumbent union is justified because the incumbent has legal duties to the teachers with respect to bargaining and contract administration that other unions and individuals do not have, and which require it to have an efficient method of communicating with the teachers. Second, citing Memphis AFT, they suggest that the access restriction is necessary to ensure "labor peace" in the school system.
 
 
 29
 That PEA has legal duties to the teachers that PLEA does not have does not justify the exclusive access policy. The access policy presently in force is both overinclusive and underinclusive with respect to that asserted justification: overinclusive, because the collective bargaining agreement does not limit PEA's use of the mail system to messages related to its special legal duties, and hence does not exclude messages simply critical of PLEA; underinclusive, because the school district permits outside organizations with no special duties to the teachers to use the system. Even if the board had attempted to tailor its access policy more closely to that justification, by excluding all private communications but PEA's and limiting PEA to messages directly related to its special duties, the fit would still be questionable, for it might be difficult both in practice and in principle effectively to separate "necessary" communications from propaganda. More fundamentally, we hold that such an exclusive access policy would be invalid even aside from questions of fit because it furthers no discernible state interest. PLEA does not argue that the school district has no legitimate interest in allowing PEA to use the mail system, but rather that the school district has no interest in making PEA's use exclusive. Without an independent reason why equal access for other labor groups and individual teachers is undesirable, the special duties of the incumbent do not justify opening the system to the incumbent alone. The defendants do not contend that equal access for others would impose significant additional expenses on the school district, nor that it would interfere with PEA's execution of its duties as bargaining representative in any way.[46]
 
 
 30
 Nor can the access policy be defended as designed to preserve labor peace. It is true that the state's compelling interest in educating the students attending its public schools permits it to prohibit behavior that "materially and substantially disrupt(s) the work and discipline of the school". Healy v. James, 408 U.S. 169, 189, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), paraphrasing Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969); Grayned v. City of Rockford, 408 U.S. 104, 117-18, 92 S.Ct. 2294, 2304, 33 L.Ed.2d 222 (1972). But "(i)n making this showing, the administration must rely on reasonable inferences drawn from concrete facts, not on the mere apprehension or speculation that disturbances or interferences with appropriate discipline will occur". Connecticut SFT, 538 F.2d at 478. See Tinker, 393 U.S. at 508-09, 89 S.Ct. at 738-39. Healy, 408 U.S. at 189-91, 92 S.Ct. at 2350-2351. The defendants here point to no specific interference with school operations that is likely to result from use of the mail system by PLEA, and we can infer none. There is no indication that PLEA intends imminently to incite a work stoppage, for example. Nor is there any reason to suppose that the mere dissemination of PLEA's messages to hostile members of PEA is more likely to provoke disruptive conflicts between members of the rival unions than PEA's ongoing dissemination of its messages to hostile members of PLEA. Indeed, face-to-face arguments in the teachers' lounges, which the defendants urge as an alternative method of communication open to PLEA, must be far more apt to disrupt than the impersonal delivery of its easily-discarded tracts. Finally, even apart from the requirements of specific pleading and proof, the labor peace argument fails because any discord PEA's communications may cause cannot "materially and substantially" disrupt the teaching process within the meaning of Tinker and Healy. Passions could hardly run higher over this labor dispute than they did over the wisdom of American involvement in Vietnam in 1965, symbolic speech about which the Supreme Court held protected in the classroom itself in Tinker.
 
 III.
 
 31
 Because the school board's grant to PEA of an exclusive right to use the internal mail system must be searchingly examined and because the board has failed adequately to justify it, we hold that it violates the first amendment and equal protection rights of the teachers who belong to PLEA. We stress the scope and limits of that holding. It is premised entirely on the discrimination between members of PEA and other teachers; at no point did we rely solely on the fact that the school district permits outside organizations to use the mail system. On the other hand, we do not hold that a school's internal mail system is a public forum in the sense that a school board may not close it to all but official business if it chooses. Furthermore, it does not follow that a school board that opens the system to a majority union may place no restrictions at all on who may use it or the content of the messages that pass through it. The school's interest in keeping outsiders off campus during school hours doubtless supports appropriate restrictions on entry for the purpose of using the mail system, and a school certainly would not be compelled to distribute literature inciting its teachers to participate in an illegal strike, for example. On a more refined level, we have no occasion to consider the validity of content or speaker restrictions that are relatively neutral with respect to viewpoint, such as a restriction of unofficial access to messages about school operations or labor relations, or an exclusion of commercial advertisements or political messages unrelated to school operations. Finally, we are not faced with and do not address the constitutional questions that may arise from a public employer's grant to a majority union of exclusive rights other than of access to communications facilities, such as a dues checkoff.[47]
 
 
 32
 The decision of the district court is reversed, and this case is remanded for proceedings in conformity with this opinion.
 
 
 
 *
 Honorable John Minor Wisdom, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, is sitting by designation
 
 
 [1]
 Ind.Code Ann. § 20-7.5-1-2(k) (Burns 1975). The exact language of the contract is:
 Article II Association Rights and Responsibilities
 Section 2 Communications
 C. The Association (PEA) is permitted access to teacher's mailboxes in which to insert material, provided the Association makes a copy available to the building principal in advance of the distribution. The Association's sponsorship shall appear on all materials which are distributed through teachers' mailboxes. The rights and privileges of the Association, acting as the representative of the teachers, as set forth in Article II, Section 2 part C of this agreement shall not be granted to any other school employee organization as defined in IC 1971, 20-7.5 more commonly known as PL 217.
 D. The association shall be permitted to use the inter-school mail system provided that the school corporation shall have no obligation to make special arrangements, incur extra expenses, or devote time beyond that required for inter-school mailing normally and routinely instituted by the school corporation. The rights and privileges of the Association, acting as the representative of the teachers, as set forth in Article II, Section 2 part D of this Agreement, shall not be granted to any other school employee organization as defined in IC 1971, 20-7.5 more commonly known as PL 217.
 
 
 [2]
 The Indiana Education Employment Relations Board prohibited either union from using the mail system immediately before the 1977 election, so we presume that they would do so in the event of another election. Note that Indiana law requires at least two years to elapse between elections. Ind.Code Ann. § 20-7.5-1-10(c)(4) (Burns 1975)
 
 
 [3]
 The plaintiffs also made a pendent state law claim, but they do not press it on appeal
 
 
 [4]
 On the former point, see generally Geed, Unionization of Mr. Chips: A Survey Analysis of Collective Bargaining in the Public Schools, 15 Willamette L.Rev. 367 (1979). On the latter, see Elrod v. Burns, 427 U.S. 347, 360-61, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976). See generally Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968)
 
 
 [5]
 Cf. Teachers Local 399 v. Michigan City Area Schools, 499 F.2d 115 (7th Cir. 1974), also out of Indiana, which involved similar substantive issues. While that case was on appeal, Indiana passed a comprehensive statute regulating collective bargaining by public school teachers and establishing the Indiana Education Employment Relations Board to adjudicate complaints under it. We did not reach the constitutional issues because of the requirement that the minority union exhaust its newly available state administrative remedy. As noted in the text of this opinion, the IEERB has since ruled similar exclusive-rights provisions valid under state law, and so, as the parties implicitly agree, it would be futile to require exhaustion in this case
 
 
 [6]
 See, e. g., notes 16-26 infra
 
 
 [7]
 The only case we have found holding unconstitutional a school district's refusal to grant a minority union access to teachers' mailboxes or other facilities while granting such privileges to a majority union is Teachers Local 399 v. Michigan City Area Schools, No. 72-S-94 (N.D.Ind. Jan. 24, 1973), vacated on other grounds, 499 F.2d 115 (7th Cir. 1974). Cf. Clifford v. Moritz, 472 F.Supp. 1094 (S.D.Ohio 1979) (granting preliminary injunction against state agency's rule that permitted nonemployee union organizers access to state mental hospital grounds only if the union already had as members at least ten percent of hospital employees statewide); University of Missouri at Columbia-National Education Association v. Dalton, 456 F.Supp. 985 (W.D.Mo.1978) (striking down rule barring all union access to university mail)
 Rejecting such claims are: Connecticut State Federation of Teachers v. Board of Education, 538 F.2d 471 (2d Cir. 1976); Memphis American Federation of Teachers Local 2032 v. Board of Education, 534 F.2d 699 (6th Cir. 1976); Teachers Local 3724 v. North St. Francis County School District, 103 L.R.R.M. 2865 (E.D.Mo.1979); Haukedahl v. School District No. 108, No. 75-C-3641 (N.D.Ill. May 14, 1976); Federation of Delaware Teachers v. De La Warr Board of Education, 335 F.Supp. 385 (D.Del.1971); Local 858, American Federation of Teachers v. School District No. 1, 314 F.Supp. 1069 (D.Colo.1970); Maryvale Educators Association v. Newman, 70 A.D.2d 758, 416 N.Y.S.2d 876, appeal denied, 48 N.Y.2d 605, 424 N.Y.S.2d 1025 (1979); Geiger v. Duval County School Board, 357 So.2d 442 (Fla.App.1978); Clark County Classroom Teachers Association v. Clark County School District, 91 Nev. 143, 532 P.2d 1032 (1975) (alternative holding).
 This tabulation does not include constitutional challenges by minority unions to exclusive rights that do not directly involve communication, such as a dues checkoff. Such challenges have uniformly been rejected. The leading case is Bauch v. City of New York, 21 N.Y.2d 599, 237 N.E.2d 211, 289 N.Y.S.2d 951, cert. denied, 393 U.S. 834, 89 S.Ct. 108, 21 L.Ed.2d 105 (1968). Many of the cases cited in the preceding paragraph also involved such issues; see also County Employees Local 22 v. County of Sacramento, 28 Cal.App.3d 424, 104 Cal.Rptr. 619 (1972). Although these cases invariably treat both sorts of exclusive right as equivalent, we think they may be distinguishable. See note 47 infra.
 
 
 [8]
 29 U.S.C. §§ 151-169 (1976)
 
 
 [9]
 NLRB v. Northeastern University, 601 F.2d 1208, 1217 (1st Cir. 1979); Dreis & Krump Mfg. Co. v. NLRB, 544 F.2d 320 (7th Cir. 1976); NLRB v. Transcon Lines, 599 F.2d 719 (5th Cir. 1979); International Association of Machinists, & Aerospace Workers, District No. 9 v. NLRB, 415 F.2d 113 (8th Cir. 1969); Container Corp. of America, 244 N.L.R.B. No. 53, at n.2 (1979); Ford Motor Co. (Rouge Complex), 233 N.L.R.B. 698 (1977); McDonnell Douglas Corp., 210 N.L.R.B. 280 (1974). Cf. Teamsters Local 515 (Roadway Express, Inc.), 248 N.L.R.B. 83 (1980) (can forbid insurgents to post notices on union bulletin board when an equivalent facility an adjacent bulletin board is available); General Motors Corp., Frigidaire Division, 240 N.L.R.B. 168 (1979) (suggests distinction between distribution of literature and posting of notices). See also Midwest Stock Exchange, Inc. v. NLRB, 635 F.2d 1255 (7th Cir. 1980)
 
 
 [10]
 Such discrimination cannot be justified on grounds of cost, for it is an unfair labor practice for an employer to "contribute financial or other support" to "any labor organization". National Labor Relations Act § 8(a) (2), 29 U.S.C. § 158(a)(2) (1976). Some forms of assistance to union efforts to communicate with employees may be permissible "cooperation" rather than unlawful "support", but not assistance that discriminates against a disfavored union. See, e. g., Chicago Rawhide Mfg. Co. v. NLRB, 221 F.2d 165, 170 (7th Cir. 1955); R. Gorman, Basic Text on Labor Law 200-03 (1976). Employers may ban on-site communication between employees where physically necessary for efficient business operations. Beth Israel Hospital v. NLRB, 437 U.S. 483, 491-93, 501-05, 98 S.Ct. 2463, 2468-70, 2473-76, 57 L.Ed.2d 370 (1978); Republic Aviation Corp. v. N.L.R.B., 324 U.S. 793, 801-03, 65 S.Ct. 982, 987-88, 89 L.Ed. 1372 (1945). But if one labor organization is allowed to communicate through a particular channel, exclusion of others obviously cannot be justified by physical necessity
 
 
 [11]
 E. g., Eastex, Inc. v. NLRB, 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978) (criticism of federal and state labor laws protected); General Motors Corp., 211 N.L.R.B. 986 (1974), enforced in relevant part, 512 F.2d 447 (6th Cir. 1975) (literature concerning candidates for intra-union election protected)
 
 
 [12]
 See National Labor Relations Act § 2(2), 29 U.S.C. § 152(2) (1976)
 
 
 [13]
 The Indiana Education Employment Relations Board qualified Pike by stating that it "expresses no opinion concerning the use of school facilities for meetings held by an exclusive representative for purposes other than for the discharge of the exclusive representative's duties of representing the bargaining unit and its individual members". But PEA's right of access here is not so limited, even if it were, that would not change the result. See page 1300 infra
 
 
 [14]
 This case presents a problem of labor relations, and although the problem is in the context of public employment, this does not alter its essential character. Plaintiffs are a labor union and its officials and members, and they are seeking to utilize only those internal channels of school communication which are not traditionally of a public nature for the purpose of furthering the goals of their union.... Thus, we do not accept plaintiffs' characterization of the issue as one of alleged impairment of broad First Amendment rights
 Local 858, American Federation of Teachers v. School District No. 1, 314 F.Supp. 1069, 1075 (D.Colo.1970), quoted in, e. g., Connecticut SFT, 538 F.2d at 480-81.
 
 
 [15]
 Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); City of Trenton v. New Jersey, 262 U.S. 182, 191-92, 43 S.Ct. 534, 538, 67 L.Ed.2d 937 (1923). See Stone, Fora Americana: Speech in Public Places, 1974 Sup.Ct.Rev. 233, 276. But cf. Lehman v. City of Shaker Heights, 418 U.S. 298, 303, 94 S.Ct. 2714, 2717, 41 L.Ed.2d 770 (1974) (plurality opinion) (justifying minimal first amendment scrutiny of city transit authority's refusal to accept political advertising or buses partly by analogy to the power of private news media to refuse such advertising)
 
 
 [16]
 Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). Cf. Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)
 
 
 [17]
 E. g., Davis v. Passman, 442 U.S. 228, 234-35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979); Personal Administrator v. Feeney, 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979); United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 569-70, 91 L.Ed. 754 (1947)
 
 
 [18]
 Smith v. State Highway Employees Local 1315, 441 U.S. 463, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (by implication); Teachers Local 1954 v. Hanover Community School Corp., 457 F.2d 456, 460 (7th Cir. 1969) (Stevens, J.); McLaughlin v. Tilendis, 398 F.2d 287, 289 (7th Cir. 1968)
 
 
 [19]
 Abood v. Detroit Board of Education, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). The same result has been reached as a matter of statutory construction with respect to unions in the private sector subject to federal labor laws, International Association of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), and the reasoning of Abood strongly suggests that that is a constitutional requirement
 
 
 [20]
 City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission, 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976)
 
 
 [21]
 Givhan v. Western Line Consolidated School District, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)
 
 
 [22]
 Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)
 
 
 [23]
 Keyishian v. Board of Regents, 385 U.S. 589, 605-10, 87 S.Ct. 675, 684-88, 17 L.Ed.2d 629 (1967); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967)
 
 
 [24]
 Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961)
 
 
 [25]
 Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)
 
 
 [26]
 E. g., United States Civil Service Commission v. National Association of Letter Carriers, 413 U.S. 548, 564-65, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973); Pickering v. Board of Education, 391 U.S. 563, 568, 569-70, 572-73, 88 S.Ct. 1731, 1734, 1735-36, 20 L.Ed.2d 811 (1968)
 
 
 [27]
 Connecticut SFT avoided passing on equal protection claims by invoking the abstention doctrine. 538 F.2d at 483
 
 
 [28]
 As far as we can discern, the phrase "public forum" was first used in Professor Kalven's seminal article, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1. Loose use of the term has not always kept courts from applying the equal access principle correctly. See, e. g., National Socialist White People's Party v. Ringers, 473 F.2d 1010 (4th Cir. 1973); Toward a Gayer Bicentennial Committee v. Rhode Island Bicentennial Foundation, 417 F.Supp. 632 (D.R.I.1976); Alaska Gay Coalition v. Sullivan, 578 P.2d 951 (Alaska 1978)
 
 
 [29]
 The limitation to "private individuals", while awkward, is necessary. Several commentators have recently pointed out that the Mosley equal access principle, in order to be workable, must be limited by a distinction between "unofficial speech", which should trigger the equal-access principle, and "legitimate official speech", which should not. A rule permitting only Democrats to give political speeches on a military base should be invalid, but the equal-access principle should not extend so far as to require viewpoints on military tactics other than those taught in the military classroom to be heard. Cf. Greer v. Spock, 424 U.S. 828, 838, n.10, 96 S.Ct. 1211, 1217, n.10, 47 L.Ed.2d 505 (1976). See Shiffrin, Government Speech, 27 U.C.L.A. L.Rev. 565, 577-88 (1980); Yudof, When Governments Speak: Toward a Theory of Government Expression and the First Amendment, 57 Tex.L.Rev. 863, 908-12 (1979). No theory has yet been developed for distinguishing between the two kinds of speech in close cases. Compare Bonner-Lyons v. School Committee, 480 F.2d 442 (1st Cir. 1973), with Buckel v. Prentice, 572 F.2d 141 (6th Cir. 1978). But because the school district here did not even purport to endorse PEA's messages or adopt them as its own and indeed, required PEA to note its sponsorship on all of its messages, see note 1 supra those messages must fall on the "unofficial" side of the line
 
 
 [30]
 See, e. g., First National Bank v. Bellotti, 435 U.S. 765, 785-86, 98 S.Ct. 1407, 1420-21, 55 L.Ed.2d 707 (1978) ("Especially where, as here, the legislature's suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended.") (footnote omitted); City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission, 429 U.S. 167, 175-76, 97 S.Ct. 421, 426-27, 50 L.Ed.2d 376 (1976); Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 544-48, 100 S.Ct. 2326, 2337-39, 65 L.Ed.2d 319 (1980) (Stevens, J., concurring in the judgment)
 
 
 [31]
 See also, e. g., Brown v. Glines, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). See generally Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U.Chi.L.Rev. 81 (1978)
 
 
 [32]
 See note 35 infra
 
 
 [33]
 See also FCC v. Pacifica Foundation, 438 U.S. 726, 745-46, 98 S.Ct. 3026, 3038-39, 57 L.Ed.2d 1073 (1978) (plurality opinion). These are, of course, questions of degree to a certain extent. Every restriction on speech implicitly favors the status quo; and "the speech suppressed by restrictions such as those involved in ... Young will almost invariably carry an implicit, if not an explicit, message in favor of more relaxed sexual mores". Stone, supra note 31, at 111-12
 
 
 [34]
 See First National Bank v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), and Consolidated Edison Co., each of which involved restrictions on both speaker and subject matter. See also City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission, 429 U.S. 167, 175 n.8, 97 S.Ct. 421, 426 n.8, 50 L.Ed.2d 376 (1976), in which the Court struck down a non-viewpoint-neutral speaker restriction on speech at an open school board meeting, but noted that a (viewpoint-neutral) subject matter restriction would be permissible
 
 
 [35]
 For example, the individual interest in self-expression may require speaker restrictions to be scrutinized rigorously in any case, see First National Bank of Boston v. Bellotti, 435 U.S. 765, 777 n.12, 98 S.Ct. 1407, 1416 n.12, 55 L.Ed.2d 707 (1978). Similarly, even viewpoint-neutral subject matter restrictions may require heightened scrutiny in some circumstances. Indeed, the opinions in Carey, Mosley, and Consolidated Edison Co. rejected subject matter restrictions as impermissible attempts to treat some kinds of constitutionally-protected speech as less valuable than others; they do not even allude to the fact that the restrictions were also non-viewpoint-neutral. We have chosen to emphasize their viewpoint-neutrality aspect because FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), Young, Lehman and Greer arguably recognize just such a hierarchy of speech protection in some circumstances. Consolidated Edison Co. rejected such a reading of Lehman and Greer on the ground that those cases involved speech on government property, 447 U.S. at 539-40, 100 S.Ct. at 2334, and Young, Pacifica and Lehman each involved some degree of audience captivity. But both of those factors should go to justification, not to the standard of review and the Court apparently did apply a weaker than normal standard of review in all four cases. We need not attempt to resolve this apparent conflict here, and so the minimal reading we give to Carey, Mosley and Consolidated Edison Co. in the text of this opinion should not be taken as intimating that we would reject their broader reading in a case involving a viewpoint-neutral subject matter restriction
 
 
 [36]
 The differences between the fundamental rights strand of equal protection and a substantive constitutional guarantee are debatable even outside this context. See, e. g., Zablocki v. Redhail, 434 U.S. 374, 391-96, 98 S.Ct. 673, 683-86, 54 L.Ed.2d 618 (1978) (Stewart, J., concurring in the judgment); Shapiro v. Thompson, 394 U.S. 618, 658-62, 89 S.Ct. 1322, 1344-46, 22 L.Ed.2d 600 (1969) (Harlan, J., dissenting). See generally Comment, Equal Protection and Due Process: Contrasting Methods of Review Under the Fourteenth Amendment, 14 Harv.C.R.-C.L.L.Rev. 529 (1979)
 
 
 [37]
 On important interest and least restrictive means, see, e. g., Martin v. City of Struthers, 319 U.S. 141, 148, 63 S.Ct. 862, 866, 87 L.Ed. 1313 (1943); Schneider v. State (of N.J.), 308 U.S. 147, 162, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939). See generally Comment, Less Drastic Means and the First Amendment, 78 Yale L.J. (1969). On closeness of fit, see, e. g., Dombrowski v. Pfister, 380 U.S. 479, 486, 85 S.Ct. 1116, 1120-21, 14 L.Ed.2d 22 (1965). See generally Note, The First Amendment Overbreadth Doctrine, 83 Harv.L.Rev. 844 (1970)
 
 
 [38]
 E. g., Kramer v. Union Free School District, 395 U.S. 621, 627, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583 (1969). See also Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (same standard applied to residency requirement burdening the right to travel); Storer v. Brown, 415 U.S. 724, 733, 94 S.Ct. 1274, 1280, 39 L.Ed.2d 714 (1974) ("compelling state interest" needed to restrict right to run for office)
 
 
 [39]
 E. g., Califano v. Wescott, 443 U.S. 76, 85, 99 S.Ct. 2655, 2661, 61 L.Ed.2d 382 (1979); Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976)
 
 
 [40]
 See Carey v. Brown, 447 U.S. 455, 460, 461, 466, 471, 100 S.Ct. 2286, 2289-90, 2290, 2293, 2296, 65 L.Ed.2d 263 (1980); First National Bank v. Bellotti, 435 U.S. 765, 774 n.8, 98 S.Ct. 1407, 1414-15 n.8, 55 L.Ed.2d 707 (1978); Young v. American-Mini Theatres, Inc., 427 U.S. 50, 67 n.27, 96 S.Ct. 2440, 2451 n.27, 49 L.Ed.2d 310 (1976) (plurality opinion), quoting Kalven, supra note 28, at 29; Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975). Cf. Carey v. Brown, 447 U.S. at 471-72, 100 S.Ct. at 2296 (Stewart, J., concurring) (insisting that Mosley and Carey rest only on the first amendment, but not explaining why). See also Note, The Public Forum: Minimum Access, Equal Access, and the First Amendment, 28 Stan.L.Rev. 117, 141 n.157 (1975)
 
 
 [41]
 An alternative ground for strict scrutiny in this case might be derived from the "suspect classification" strand of equal protection, however. If strict scrutiny of suspect classifications is meant to protect those who cannot adequately protect themselves in the political arena, see United States v. Carolene Products Co., 304 U.S. 144, 152 n.4, 58 S.Ct. 778, 783-784 n.4, 82 L.Ed. 1234 (1938); see generally J. Ely, Democracy and Distrust 135-75 (1980), then PLEA arguably qualifies for particular judicial solicitude. PLEA had no effective way to influence the collective bargaining process that resulted in the exclusive-access policy, since Indiana law made PEA the exclusive bargaining representative of the teachers. And, because of the school board's natural interest in quiet and stable labor relations, and PEA's natural interest in self-perpetuation, neither was in a position to assess the costs and benefits of the exclusive-access rule in a disinterested manner or motivated to preserve the institutional interests of the minority. If a bargaining representative is "clothed with power not unlike that of a legislature" over the members of its bargaining unit, Steele v. Louisville & Nashville R.R., 323 U.S. 192, 198, 65 S.Ct. 226, 230, 89 L.Ed. 173 (1944), it is a legislature in which the institutional interests of the members of a minority union are, by design, peculiarly under-represented. It may seem novel to apply suspect classification analysis to groups other than those that have suffered society-wide discrimination simply because they are underrepresented at the point of decision, cf. Stewart, The Reformation of American Administrative Law, 88 Harv.L.Rev. 1667, 1787-88 (1975), but novelty alone is no objection. Indeed, the case for suspect classification analysis here is stronger than usual in that one important theoretical problem does not apply: it may be difficult to distinguish a "discrete and insular" minority from a mere loser in the political process in some cases, but not here, where the losers are under a de jure handicap. The most significant argument against suspect classification analysis is that minority unions are not systematically disadvantaged from seeking change before the Indiana legislature. But an analogous argument has been rejected in analysis of voting restrictions in elections to political subdivisions. Kramer v. Union Free School District, 395 U.S. 621, 628, 89 S.Ct. 1886, 1890, 23 L.Ed.2d 583 (1969). Cf., e. g., Ball v. James, --- U.S. ----, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981) (one-man, one-vote principle need not be followed in elections to special-purpose state agency). Ball is distinguishable in that it rejected a claim that the structure of the agency's decisionmaking process was unconstitutional; it does not imply that particular actions by the agency that discriminate against underrepresented interests should not be searchingly examined. See also note 47 infra
 
 
 [42]
 See generally Kalven, Equality as a Central Principle in the First Amendment, 43 U.Chi.L.Rev. 20 (1975); Note, supra note 40; Stone, supra note 15
 
 
 [43]
 See also, e. g., Knights of the KKK v. East Baton Rouge Parish School Board, 578 F.2d 1122 (5th Cir. 1978); Gay Students Org. v. Bonner, 509 F.2d 652 (1st Cir. 1974); Hennessey v. Independent School District No. 4, 552 P.2d 1141 (Okl.1976)
 
 
 [44]
 See FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (plurality opinion); Young v. American Mini Theatres, Inc., 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) (plurality opinion). See notes 33, 35 supra
 
 
 [45]
 See Consolidated Edison Co. v. Public Service Commission, 447 U.S. 530, 541 n.10, 100 S.Ct. 2326, 2335 n.10, 65 L.Ed.2d 319 (1980); Linmark Associates, Inc. v. Willingboro, 431 U.S. 85, 93, 97 S.Ct. 1614, 1618, 52 L.Ed.2d 155 (1977); Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976)
 
 
 [46]
 Cf. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975), which granted a claim for access to a municipal theatre by the promoter of a controversial production. Although Conrad rested mainly on the city's failure to follow the procedural requirements necessary for a valid prior restraint, the holding also seems to imply a substantive right of equal access. Conrad leaves unclear the scope of the state's power to edit with respect to state-owned facilities that can only be used by a limited number of persons. Note, however, that the argument for access in this case is much stronger than in Conrad, because there is no effective limit on the number of people who can simultaneously use the mail system; the marginal cost of delivering additional messages is nil. See generally Karst, Public Enterprise and the Public Forum: A Comment on Southeastern Promotions, Ltd. v. Conrad, 37 Ohio St.L.J. 247 (1979); Comment, Access to State-Owned Communications Media The Public Forum Doctrine, 26 U.C.L.A. L.Rev. 1410 (1979)
 
 
 [47]
 It is arguable that a dues checkoff for the majority union alone would unconstitutionally chill the minority's right to associate or violate their equal protection rights. See nn.7, 18 supra. But because a discriminatory checkoff would not directly interfere with speech, it arguably should be subject to a much less stringent standard of review. Cf. City of Charlotte v. Local 660, International Association of Firefighters, 426 U.S. 283, 96 S.Ct. 2036, 48 L.Ed.2d 636 (1976) (applying rational basis scrutiny to reject equal protection attack on city's refusal to grant checkoff for union while providing checkoff for certain other programs and organizations). Charlotte held rational the city's distinction between programs in which all employees could, without more, participate, and organizations such as a union, a checkoff for which would only benefit union members. Note that that distinction would not exist as between competing unions, unless an agency shop arrangement were in force. See also note 41 supra, the reasoning of which suggests that any exclusive-rights provision in a public-sector collective bargaining agreement in favor of an incumbent union is a candidate for heightened scrutiny. Such a provision could be valid if it serves an important purpose, as with provisions affirming the principle of exclusive representation itself, or as with an exclusive dues checkoff provision coupled with an agency shop arrangement, which has the permissible goal of eliminating "free riders", see Abood v. Detroit Board of Education, 431 U.S. 209, 221-23, 97 S.Ct. 1782, 1792-93, 52 L.Ed.2d 261 (1977); but an exclusive checkoff provision not coupled to an agency shop would seem difficult to justify